IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**RUST-OLEUM CORPORATION,**                          Case No. 1:18-cv-01655-CL

     Plaintiff,

   v.                                                    **OPINION & ORDER**

**NIC INDUSTRIES, INC.,**

     Defendant.

_____

**CLARKE**, Magistrate Judge.

  Plaintiff Rust-Oleum Corporation ("Rust-Oleum") brings this action against Defendant NIC Industries, Inc. ("NIC") for claims arising out of an Exclusive Sales Agreement ("Sales Agreement") and Mutual Settlement Agreement ("Settlement Agreement"). This case comes before the Court on cross-motions for summary judgment. The Court held a telephonic oral argument hearing on September 19, 2023. For the reasons below, NIC's motion (#199) is GRANTED and Rust-Oleum's motion (#202) is DENIED.

## BACKGROUND

  Rust-Oleum Corporation, a division of RPM International, manufactures its own line of paints, stains, and coatings. NIC Industries manufactures powder coatings and ceramic polymer coatings through its divisions, Prismatic Powders and Cerakote.

KiON HTA 1500 Polysilazane ("PSZ") is a resin that was invented and patented by Dr. Alexander Lukacs and Mr. Gary Knasiak in 2000. Defendant NIC began purchasing PSZ in early 2000 to incorporate with other ingredients in an effort to develop commercial coating products. NIC spent years experimenting with PSZ confidentially and eventually found mixed success with formulated clear coatings. During this time, PSZ's commercial rights traded hands from Clariant to AZ Electronics to EMD. EMD created the tradename "Durazane 1500."

NIC for years has manufactured and sold its clear coating in a spray-on product called Cerakote MC-156 Crystal Mirco Clear ("MC-156"). Hall Decl., ECF No. 200. MC-156 is applied by professionals with commercialized spray equipment to protect surfaces from corrosion. MC-156 derives its high performance from the active ingredient Durazane, which bonds better to metal and provides longer protection.

Tony Bender of the Avento Company contacted NIC in 2012 to discuss a potential new use for MC-156. The parties executed a confidentiality agreement upon Mr. Bender's request, and he shared the following. An NIC customer had discovered that wiping MC-156 onto faded automotive trim restored a new-like appearance. Avento and NIC spent the next several months working on packaging, shipping, and regulatory issues for retail consumer sales. They called the product "Wipe New." The parties executed a Limited Exclusive Sales Agreement whereby NIC sold MC-156 to an Avento Company called Showroom for resale as Wipe New. Def. MSJ, ECF No. 199, Ex. 6. The parties agreed to keep their relationship confidential and NIC agreed to not knowingly sell MC-156 to others for wipe-on use ("Covered Application"). NIC retained ownership of the proprietary rights and information to the MC-156 formula, and Showroom owned the Wipe New brand name. This agreement was replaced by a Limited Exclusive Sales

Agreement between NIC and Wipe New LLC ("LLC"), adding terms for a minimum purchase requirement. Def. MSJ, ECF No. 199, Ex. 8.

Plaintiff Rust-Oleum began negotiations with LLC in September of 2014. Rust-Oleum expressed interest in acquiring a license to the Wipe New brand name and rights to the Sales Agreement with NIC. NIC's identity was not disclosed to Rust-Oleum. It was during this period, and in-part because of Rust-Oleum's requests, that LLC executed a new Exclusive Sales Agreement with NIC on September 4, 2015. Def. MSJ, ECF No. 199, Ex. 15 ("Sales Agreement"). This agreement contained three changes: the name for MC-156 changed to AV-945, the minimum annual purchase requirement was reduced, and the Covered Application was narrowed to specific Wipe New products in the addendum. Rust-Oleum and LLC finalized the acquisition on November 30, 2015, by executing a Trademark and Technology License Agreement. LLC assigned its rights and obligations under the Sales Agreement to Rust-Oleum the same day, forming a contractual relationship between Plaintiff Rust-Oleum and Defendant NIC. Pl. MSJ, ECF No. 202. The Sales Agreement contains the following key provisions at issue in this case:

> **1. Grant of Exclusive Right to Purchase.** NIC hereby agrees that during the term of this Agreement…it will not sell or otherwise distribute the Product to any other persons or entities…which are known or suspected by NIC to use the Product for use in the Covered Application. NIC shall retain the right to sell the Product and all other NIC products to other purchasers…during the term of this Agreement, provided that such purchasers are not actually known by NIC to be engaged in the Covered Application as of the date of this Agreement. … NIC will use commercially reasonable efforts to track the end uses of the Product.
>
> **8.1 Representations and Warranties of NIC.** NIC warrants that it owns the Product technology and has the right to sell the Products to Wipe New under the terms of this Agreement.

> **13.1 Confidentiality Regarding NIC Products.** Wipe New
> acknowledges and agrees that NIC is the owner of all proprietary
> rights in NIC products, including but not limited to information
> regarding the Product and the formulas, design or manufacture
> of such products…and that such information constitutes trade secrets
> of NIC. Wipe New is not granted any right to use, disclose,
> duplicate (including but not limited to reverse engineering and/or
> efforts to reverse engineer the Product) license, sell or reveal any
> portion of the Confidential Information.

"Product" is defined as AV-945, "the moisture-curable silicon-based polymer used in Wipe New products." The "Covered Application" refers to the Product being used as "a wipe on application for vehicle restoration, detailing, and general home use."

NIC eventually disclosed its existence as the supplier of Wipe New's formula; however, at all times NIC declined to disclose Wipe New's chemical composition. Rust-Oleum first inquired about the composition prior to acquiring Wipe New. Rust-Oleum anticipated sales in California and claimed disclosure was necessary to ensure compliance with certain environmental regulations. The parties addressed this concern by developing a second formula called California Compliant Wipe New. Rust-Oleum ran consumer tests and was satisfied that California Compliant was comparable to the original. The second formula was also kept confidential, but NIC's assurances and Rust-Oleum's tests provided enough inducement for Rust-Oleum to proceed with the acquisition. Rust-Oleum maintains, however, that it did not receive enough information to adequately address the remaining regulatory issues posed by Rust-Oleum's retail plans. Pl. MSJ, ECF No. 202, Ex. 14. Rust-Oleum contends that without disclosure of each ingredient, it was unable to comply with registration requirements in Australia and Japan and labeling regulations in the US. This in turn impacted Rust-Oleum's volume projections. Rust-Oleum asserts that NIC's continued refusal to disclose Wipe New's chemical composition forced Rust-Oleum to conduct the following tests.

From 2014 to 2016 Rust-Oleum performed three rounds of Fourier Transform Infrared

Spectroscopy ("FTIR") and Gas Chromatography Mass Spectrometry ("GCMS"). Pl. MSJ, ECF

No. 202. FTIR and GCMS are techniques that utilize infrared rays and vaporization to identify

substances within a sample. The first few rounds were inconclusive according to Rust-Oleum.

Lead chemist, Dr. Haewon Uhm, Ph.D., testified to having independent familiarity with

Durazane which led her to the conclusion that Durazane and Wipe New share similar properties.

She claims to have incorporated a sample of Durazane from EMD into FTIR tests in March

2016, which conclusively established that Durazane was the secret ingredient in NIC's Wipe

New formula. Rust-Oleum's development team subsequently launched "Project Torpedo" with

the objective of "develop[ing] a formulation that will perform equal to the current Wipe New

Original formulation." Def. MSJ, ECF No. 199, Ex. 33.

By late 2017, Rust-Oleum claimed it could no longer meet minimum purchase

expectations. Rust-Oleum and NIC entered into the Mutual Settlement Agreement on November

27, 2017, ending their exclusive sales relationship. Def. MSJ, ECF No. 199, Ex. 38 ("Settlement

Agreement). The Settlement Agreement contained the following key provisions:

> **2. Mutual Release.** Except for the obligations of the parties under
> this Release, each of the parties hereby releases, acquits, and
> forever discharges each other…from any and all claims, demands,
> claims for relief (whether in contract, tort, or equity),_costs,
> damages, attorney fees, liability and expense of any nature, known
> or unknown, suspected or unsuspected, in any matter related to, or
> arising out of the Agreement through the effective date of this
> Release.

> **3. Continuing Obligations of RO.** Notwithstanding the
> termination of the Agreement…RO will continue to remain
> obligated with respect to Sections 6 (Restriction on Resale of the
> Product), 9 (Intellectual Property), 11 (Disclaimer of Warranties;
> Limitation of Liability), 12 (Indemnification; Insurance), and 13
> (Confidentiality) of the Agreement. RO hereby represents and
> warrants to NIC that it has complied fully with each and every one

> of such obligations up to and including the Effective Date of this
> Release, and that RO will continue to comply fully with each and
> every one of such obligations thereafter.

In 2018, NIC learned Rust-Oleum was still selling Wipe New after its supply from NIC

should have been exhausted. NIC served Rust-Oleum with a Cease and Desist letter on August

24, 2018. Rust-Oleum filed this lawsuit on September 12, 2018.

Rust-Oleum filed contract and fraud claims, alleging NIC misrepresented proprietary

rights and exclusivity thereby fraudulently inducing Rust-Oleum's assent to the Sales and

Settlement Agreements. NIC filed counterclaims for breach and trade secret violations arising

out of the reverse engineering and product duplication performed by Rust-Oleum. Both parties

move for summary judgment on all opposing claims.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material of fact and that the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The

moving party has the initial burden of showing that no genuine issue of material fact exists.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076

(9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may

only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d

796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to

the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at

250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion

for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the

opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts

which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether

a party has met its burden, the court views the evidence in the light most favorable to the non-

moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## SUMMARY

Defendant NIC moves for summary judgment on each of Plaintiff Rust-Oleum's claims,

including fraud in the inducement, breach of contract, declaratory judgment, and breach of the

implied duty of good faith and fair dealing. Rust-Oleum moves for summary judgment on each

of NIC's counterclaims, including breach of contract, misappropriation of trade secrets, and

fraud.

NIC is entitled to summary judgment on all claims brought by Rust-Oleum for two

reasons. First, the Settlement Agreement, negotiated by sophisticated parties with counsel,

clearly provides that Rust-Oleum released NIC from "any and all claims…known or unknown

…arising out of the Agreement." Second, the summary judgment record contains no facts to

support Rust-Oleum's claims on the merits: there is no evidence NIC committed fraud in

connection with the Sales Agreement or Settlement Agreement. Rust-Oleum is not entitled to

summary judgment on all claims brought by NIC. There is no evidence to support Rust-Oleum's

allegations of breach, unilateral mistake, or Sherman Act violations such that Rust-Oleum would

be entitled to judgement as a matter of law on NIC's first counterclaim. NIC has demonstrated

genuine issues of fact with respect to the remaining claims.

The Court therefore grants summary judgment in favor of NIC on all claims brought by Rust-Oleum and denies Rust-Oleum's motion for summary judgment against NIC's counterclaims.

## DISCUSSION

I.    **NIC's motion for summary judgment on all claims brought by Rust-Oleum is GRANTED.**

   a.    **NIC is entitled to summary judgement because Rust-Oleum clearly released NIC from "any and all claims…known or unknown" in the Settlement Agreement. The release is unambiguous and includes fraud in the inducement.**

Plaintiff Rust-Oleum and Defendant NIC dispute whether, as a matter of law, the Settlement Agreement's general release bars Rust-Oleum from asserting a fraud in the inducement claim.

A release is a contract through which a party agrees to abandon a claim or right. *Lindgren v. Berg*, 307 Or. 659, 665 (1989); *Glickman v. Weston*, 140 Or. 117, 123 (1932). As such, they "are a species of settlement agreement and … favored by the law." *Pioneer Res., LLC v. D.R. Johnson Lumber Co.*, 187 Or. App. 341, 356 (2003). Courts apply the rules of contract construction and interpretation when deciphering a release. *Ristau v. Wescold, Inc.*, 318 Or. 383, 387 (1994). If the contract is unambiguous, it must be enforced according to its terms. *Id.* Ambiguity is a question of law for the courts, found only where a contract is capable of more than one sensible, reasonable interpretation. *Id.*; *Pioneer Res.*, 187 Or. App. at 361. If ambiguous, a trier of fact must discern the intent of the parties. *Ristau*, 318 Or. at 387; *OSEA v. Rainier Sch. Dist. No. 13*, 311 Or. 188, 194 (1991). Summary judgment is appropriate where the contract in question is unambiguous. *Brown v. American Prop. Mgmt. Corp.*, 167 Or. App. 53, 61 (2000).

In *Lindgren*, the Oregon Supreme Court held that a release explicitly including claims for fraud bars future fraud claims even where the release itself was induced by fraud. *Lindgren*, 307 Or. at 666. The court noted that where each party is represented by lawyers during negations and drafting, the likelihood of misunderstanding between the parties is greatly reduced and "undercuts plaintiffs' argument that [defendant] fraudulently induced the release." *Id.* at 665-66. In *Ristau*, the Court decided whether an agreement releasing "any and all claims, known and unknown" precludes a fraudulent inducement claim when the agreements were executed contemporaneously.[1] *Ristau*, 318 Or. at 387. The court held that "a general release from all claims and demands is sufficient to bar a specific claim, unless the claim is excepted from the release." *Id.* at 389. The Court rejected the contention that an unambiguous release "must include an explicit reference to fraud claims arising contemporaneously with the release." *Id.* at 388. The Court found further support for this point in the fact that the parties specifically excluded from the release certain obligations the parties intended to remain intact. *Id.*

In certain circumstances, courts in Oregon have held a release as void if the party was fraudulently induced to enter the agreement. *See Whitehead v. Montgomery Ward & Co., Inc.*, 194 Or. 106 (1952); *Teegarden v. State*, 270 Or. App. 373 (2015); *Kim v. Allstate Ins. Co.*, 102 Or. App. 529 (1990). "[I]f the evidence discloses that plaintiff was induced to enter into [the] agreement by means of defendant's fraud or material misrepresentation, the transaction is voidable as against defendant." *Whitehead*, 194 Or. at 131-32. However, *Whitehead* involved an employer fraudulently inducing its employee to release claims for workmen's compensation. *Id.*

---

[1] Rust-Oleum argues *Ristau* is distinguishable from the present matter because the fraud alleged in *Ristau* arose from a separate agreement executed concurrently with the release, rather than the release itself. The case however stands for the proposition that an unambiguous, general release is sufficient to bar claims not explicitly included, particularly where counsel is present. The fact that *Ristau* concerned concurrently executed agreements is a distinction of no consequence here and does not undermine the case's otherwise relevant reasoning.

*Kim*, relying on *Whitehead's* reasoning, involved a claims adjustor fraudulently inducing an uninsured motorist to release claims arising from a collision. *Kim*, 102 Or. App. at 533. *Teegarden* involved an employer fraudulently inducing an employee to release claims arising out of a hostile firing. *Teegarden*, 270 Or. App. 373.

Neither *Whitehead* nor *Kim* involves a plaintiff represented by counsel during the execution of the release. The facts of *Whitehead, Kim,* and *Teegarden* include disenfranchised plaintiffs on the cusp of injustice, concerned with personal injury and employment disputes. By contrast, the facts of *Ristau* and *Lindgren* include sophisticated parties, acting through counsel to navigate complex acquisitions. Rust-Oleum and NIC are two sophisticated parties. Each maintains a business that produces and sells nation-wide and engages in contracts and acquisitions on a regular basis. Each was represented by attorneys during the negotiations, drafting, and signing of the Sales and Settlement Agreements. The facts of this case are thus more similar to the facts of *Ristau* and *Lindgren*, and the Settlement Agreement's general release is sufficient to bar a claim of fraud or fraud in the inducement.

Additionally, NIC and Rust-Oleum each intentionally carved out specific claims to be excluded from the release. In Section 3 of the Settlement, the parties mutually consented to continuing obligations for Rust-Oleum. As in *Ristau*, this carve out is further support that the parties intended to release all claims not specifically excluded.

The Court finds no genuine issue of material fact that Rust-Oleum's claims were all validly and intentionally released in the Settlement Agreement.

**b. NIC is further entitled to summary judgment on the merits of all claims brought by Rust-Oleum, even without the release, because the record does not show that NIC committed fraud.**

Plaintiff Rust-Oleum released all claims in the Settlement Agreement. However, even if it had not, Rust-Oleum's claims would still fail on the merits for lack of evidence that Defendant NIC committed any fraud in connection to the Sales Agreement or Settlement Agreement.

Rust-Oleum claims it is entitled to avoid the Agreements under a fraud-in-the-inducement theory, based on Defendant NIC's alleged misrepresentations regarding its proprietary rights and exclusivity.

A party can avoid a contract under a fraud-in-the-inducement theory by showing the other party "made a false representation of material fact and that the person to whom the representation was made was induced to enter the agreement in reliance on that misrepresentation." *State v. Huttenbauer*, 301 Or. App. 332, 344-45 (2019); *see also Graves v. Tulleners*, 205 Or. App. 267, 277 (2006). Establishing such reliance requires proof of a causal relationship between the misrepresentation and the party's assent. *Gardner v. Meiling*, 280 Or. 665, 671 (1977). The party alleging fraud has the burden of proving each element by clear and convincing evidence. *Conzelmann v. Nw. Poultry & Dairy Prods. Co.*, 190 Or. 332, 350 (1950).

### i. Proprietary Rights Issue

Rust-Oleum claims NIC falsely represented itself as the owner of Durzane's proprietary rights, which induced Rust-Oleum's assent to the Sales Agreement in reliance of such ownership. Section 13.1 of the Sales Agreement states in relevant part:

> Wipe New acknowledges and agrees that NIC is the owner of all proprietary rights in NIC products, including but not limited to information regarding the Product and the formula, design or manufacture of such products...and that such information constitutes trade secrets of NIC. Wipe New is not granted any right to use, disclose, duplicate (including but not limited reverse

... 

> engineering and/or efforts to reverse engineer the Product)...or
> reveal any portion of the Confidential Information.

Section 8.1 provides:

> NIC warrants that it owns the Product technology and has the right
> to sell the Products to Wipe New under the terms of this
> Agreement.

Rust-Oleum contends that by saying it owns "information regarding the Product and the

formula" as well as "the Product technology," NIC was representing to Rust-Oleum it owned the

proprietary rights to Durazane specifically.

The Court disagrees. The language of the Agreement is clear and unambiguous. The

"Product" is defined as AV-945, "the moisture-curable silicon-based polymer used in Wipe New

products." The word "Durazane" does not appear anywhere in the Sales Agreement and nothing

in the Sales Agreement indicates that NIC owns Durazane as a stand-alone product. The plain

meaning of the Sales Agreement therefore shows that NIC owns the finished, formulated product

called Wipe New, nothing more.

Rust-Oleum attempts to deny such a clear understanding by arguing NIC's statements

that it owned the "Product technology" are tantamount to NIC claiming it owned each

constituent ingredient. This is not a reasonable interpretation of the Sales Agreement. In any

industry, it is standard for a finished good to be the product of multiple component parts. Each

part is purchased through other manufacturers who each own the proprietary rights to that part.

Campbells doesn't own each ingredient in its soups. Boeing doesn't own each piece of a 747.

Clorox doesn't own each chemical in its wipes and sprays. Here, ownership of the "product

technology" does not lead to the conclusion NIC owns each constituent ingredient. It just means

NIC owns the combination of ingredients that together make Wipe New. There is no fraud in this

statement. Rust-Oleum has not met its burden of demonstrating that any false representations were made by NIC with respect to the Sales Agreement.

A fraud claim also implicitly requires proof of a causal relationship; the party induced to assent must have done so relying on the misrepresentation. Here, there is no evidence that when the parties executed the Sales Agreement, Rust-Oleum did so *because* it believed NIC owned Durazane based on NIC's assurances. The record is void of any contemporaneous proof that anyone at Rust-Oleum sought Wipe New for the specific purpose of simultaneously acquiring the rights to Durazane. Rust-Oleum has not met its burden in this respect either.

Furthermore, even if that were the case during the Sales Agreement, Rust-Oleum discovered that NIC did not own Durazane prior to executing the Settlement Agreement and nonetheless chose not to exclude fraud claims from the release. Between 2014 and 2016 Rust-Oleum performed three rounds of FTIR and GCMS, conclusively identifying Durazane by March 2016. Rust-Oleum's officers corresponded about the results via email on September 27, 2017: "The reason everything has been so secretive is they really just buy this resin from someone we could also buy this material from [and] at a much lower cost than buying through NIC." Def. MSJ, ECF No. 199, Ex. 35. Rust-Oleum executed the Settlement Agreement two months later, in which it denied ever reverse engineering Wipe New: "RO...warrants to NIC that it has complied fully with each and every one of" its obligations not to duplicate, reverse engineer, or otherwise violate NIC's trade secrets. *See* Def. MSJ, ECF No. 199, Ex. 38. Rust-Oleum, like NIC, had a full and fair opportunity to exclude claims from the release. Had Rust-Oleum truly been defrauded by NIC in the Sales Agreement as it claims, it is unclear why Rust-Oleum and its legal counsel would release "any and all claims ... arising out of the [Sales] Agreement."

Rust-Oleum has not met its burden of producing clear and convincing evidence that NIC

fraudulently misrepresented itself as the owner of all proprietary rights to Durazane. Rust-

Oleum's fraud claim fails on the merits with respect to the Sales Agreement.

### ii. Covered Application Issue

Rust-Oleum also alleges fraud in connection to the Settlement Agreement. In relevant

part, Section 1 of the Sales Agreement provides:

> NIC hereby agrees that during the term of this Agreement, except
> as specifically provided herein, it will not sell or otherwise
> distribute the Product to any other persons or entities, other than
> Wipe New, which are known or suspected by NIC to use the
> Product for use in the Covered Application. NIC shall retain the
> right to sell the Product and all other NIC products to other
> purchasers, distributors and third parties during the term of this
> Agreement, provided that such purchasers are not actually known
> by NIC to be engaged in the Covered Application as of the date of
> this Agreement.... NIC does not and cannot make any
> representations or warranties concerning the end use of the
> Product. NIC will use commercially reasonable efforts to track the
> end uses of the Product by its customers and will discontinue
> immediately any sales of the Product to any customer if NIC
> learns, or has reason to believe, that such customer is or has the
> intention of using the Product in the Covered Application.

During settlement negotiations, NIC assured Rust-Oleum that it had complied with Section 1 of

the Sales Agreement and maintained exclusivity. Rust-Oleum claims to have since discovered

sales records that prove NIC sold products in contravention of the Covered Application and

otherwise failed to track end uses. Rust-Oleum contends NIC's misrepresentations of compliance

induced Rust-Oleum's assent to the Settlement Agreement.

The summary judgement record does not support Rust-Oleum's argument. The sales

records contain invoices reflecting NIC sold MC-156 to other companies before, during, and

after the Sales Agreement was operative. See Pl. MSJ, ECF No. 202, Exs. 25, 26, 27. NIC

distributing MC-156 is not the contested issue. A violation of Section 1 requires Rust-Oleum to

show that NIC sold Wipe New (AV-945) to a third-party with the knowledge it would be used as

a wipe-on application during the two years the Sales Agreement was operative. NIC admits it

continued to sell MC-156, the formula for the Cerakote clear coating NIC has been producing

since the early 2000's. Cerakote differs dramatically from Wipe New with respect to the Covered

Application; Cerakote requires trained professionals to spray on the product with commercial

equipment. The Settlement Agreement explicitly permitted NIC to "retain the right to sell the

Product and all other NIC products to other purchasers…during the term of this Agreement,

provided that such purchasers are not actually known by NIC to be engaged in the Covered

Application." This language unambiguously prohibits NIC from selling the Product, defined as

the formulated product for Wipe New, or other NIC products with the knowledge they will be

used as wipe-on applications. The record does not contain such sales.

  Rust-Oleum's fraud allegations also hinge on the second half of NIC's obligation: NIC

will use "commercially reasonable efforts" to track the end uses of the Product and discontinue

sales if the customer is using the Product in the Covered Application. Rust-Oleum deposed NIC

president Mr. Brian Hall to inquire about the invoices. *See* Pl. Memo., ECF No. 208, Exs. 7, 11,

16. Some of the invoices reflected NIC selling formulas to its customers, and some of the

invoices reflected NIC acting as a distributor on EMD's sales to EMD customers. Rust-Oleum

argues Mr. Hall's inability to recall what each named customer did with the products sold is

evidence that "NIC did nothing whatsoever to monitor and/or discontinue such sales and uses."

Pl. MSJ, ECF No. 202. Rust-Oleum relies on these invoices and suggests that had NIC

conducted a "cursory search" of the companies' websites, NIC would have been able to conclude

that those customers were using MC-156 for wipe-on use. This claim is unsubstantiated, lacking

any evidence to show what the referenced websites looked like from 2015-2017.

NIC defends that although it could not say with certainty what each customer did with its materials, it could discern end use from the customer's final product. Mr. Hall testified to reviewing daily sales reports and having a general familiarity with NIC's customers and websites. Def. Memo., ECF No. 203, Exs. 5-6. He explained that NIC monitored its products through social media and stories submitted by customers detailing home use. Mr. Hall testified that outside of one breach, for which NIC discontinued sales, neither "Rust-Oleum nor Wipe New nor NIC could ever find" a competing product or use in the market. Ms. Ashley O'Donnell, Rust-Oleum's representative, was likewise unaware of an instance wherein NIC sold a product in the Covered Application. Def. Memo., ECF No. 203, Ex. 4. The adequacy of NIC's monitoring mechanisms is bolstered by the fact that NIC has caught as many breaches as Rust-Oleum. NIC moreover is not obligated to track every sale containing a unit of Durazane. NIC acknowledged it "does not and cannot make any representations or warranties concerning the end use of the Product." NIC is obliged only to use "commercially reasonable efforts" to track end use of AV-945 and discontinue if it violates the Covered Application. NIC sells thousands of products to distributors and retailers all over the country, who in turn contact enumerable consumers. It's not "commercially reasonable" to expect NIC to track the end use of each customer. Given the magnitude of NIC's business, the Court is satisfied that NIC's monitoring was "commercially reasonable." NIC therefore did not commit fraud when it represented to Rust-Oleum that it complied with its obligations under the Covered Application.

NIC is entitled to judgement as a matter of law on all claims brought by Rust-Oleum. Rust-Oleum clearly and unambiguously released all claims in the Settlement Agreement. The summary judgement record is further void of any facts to support Rust-Oleum's claims on the

merits. There is no genuine issue of fact that NIC did not commit fraud in connection to the Sales

Agreement and Settlement Agreement, as Rust-Oleum alleges.

**II.     Rust-Oleum's motion for summary judgment on all counterclaims brought by NIC is DENIED.**

Plaintiff Rust-Oleum moves for summary judgment on each of Defendant NIC's

counterclaims, including breach of contract, misappropriation of trade secrets, and fraud. Rust-

Oleum is not entitled to summary judgment on these claims for two reasons. First, there is no

evidence to support Rust-Oleum's allegations of breach, unilateral mistake, and Sherman Act

violations such that Rust-Oleum would be entitled to judgement as a matter of law. Second, NIC

has demonstrated genuine issues of fact with respect to the remaining claims.

> **a. Rust-Oleum is not entitled to summary judgment on NIC's first counterclaim (breach of contract) because the record does not support Rust-Oleum's allegations of unilateral mistake, breach, or Sherman Act violations.**

Plaintiff Rust-Oleum moves for summary judgment on Defendant NIC's breach of

contract claim, arguing it fails for three reasons: Rust-Oleum acted under a unilateral mistake,

NIC was the first to breach, and the Agreements are barred by the Sherman Act.

### i. *Unilateral Mistake and Breach*

A party may avoid a contract based on a unilateral mistake by proving there was a

mistake that was basic and known to the other party, or that a reasonable person should have

known of the mistake. *Gardner v. Meiling*, 280 Or. 665, 674 (1977); *G. E. Supply Corp. v.

Republic Cons. Corp.*, 201 Or. 690 (1954). The mistake must be a misapprehension of a material

fact basic to the agreement. *Gardner*, 280 Or. at 674.

The Sales Agreement states NIC owns "all proprietary rights" to its products. Rust-

Oleum claims it misinterpreted "all" to mean NIC owned Durazane and thus entered the Sales

Agreement under a false premise. Rust-Oleum maintains that Durazane's ownership was

somehow fundamental to Rust-Oleum's execution of the Sales Agreement. Therefore, because Rust-Oleum was mistaken, it claims it is entitled to avoid the Sales Agreement.

The Court is unpersuaded. It is unclear how the rights to Durazane could be fundamental to the Sales Agreement when Durazane's existence wasn't known by Rust-Oleum until after executing Sales Agreement. The Court is moreover unconvinced that Rust-Oleum was falsely mislead by NIC as it claims. Such an allegation relies on findings the Court has already rejected: there is no evidence NIC fraudulently misrepresented the propriety rights to Durazane. The plain meaning of the Sales Agreement is clear and unambiguously provides that NIC owns the formulated product, Wipe New. Rust-Oleum has not produced evidence that it operated under any such mistake or that NIC knew Rust-Oleum was mistaken. Moreover, given the plain meaning of the Agreement, its not reasonable for one to assume such a mistake occurred.

Rust-Oleum's breach claim fails for similar reasons. There is no evidence in the record to support a finding that NIC misrepresented Durazane's ownership or that NIC violated the Covered Application. Rust-Oleum therefore has not shown NIC breached the Sales Agreement or Settlement Agreement first, thereby relieving Rust-Oleum of its obligations.

The summary judgment record cannot support a finding that Rust-Oleum entered the agreement based on a unilateral mistake nor that NIC breached the contract first. Rust-Oleum is not entitled to judgement as a matter of law on this claim.

### ii. The Sherman Act

Rust-Oleum also claims that NIC's breach of contract counterclaim fails as a matter of law under the Sherman Act.

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. The Supreme Court has

interpreted Section 1 to "prohibit only unreasonable restraints of trade." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022); *see also NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 98 (1984). Some restraints are deemed per se violations and presumed anticompetitive, while most restraints are subject to the fact-specific rule of reason. *PLS.Com*, 32 F.4th at 833.

Rust-Oleum argues that NIC's breach of contract claim is based on an interpretation of the Settlement Agreement so overly broad, it converts the Agreement into a per se unreasonable restraint on trade. According to Rust-Oleum, NIC is seeking to enforce the Settlement Agreement as an imperishable noncompete, prohibiting "Rust-Oleum from competing against it in the automotive restoration and detailing market into perpetuity by prohibiting its use of Durazane." Pl. Mot., ECF No. 202. Were Rust-Oleum's characterization accurate, the Settlement Agreement would potentially be an unreasonable restraint on trade. NIC's breach claims are contrarily quite confined. NIC accuses Rust-Oleum of violating their agreement not to reverse engineer or duplicate Wipe New, and of disclosing confidential information. Def. Answer, EFC No. 77. Section 3 of the Settlement Agreement, read in conjunction with the Sales Agreement, is a standard agreement not to steal the other's proprietary information and intellectual property. Read plainly, Rust-Oleum is not permitted to steal the Wipe New formula. There is nothing unreasonably restrictive about that arrangement.

Rust-Oleum is not entitled to judgement as a matter of law on this claim.

**b. Rust-Oleum is not entitled to summary judgment on NIC's second counterclaim (misappropriation of trade secrets) because NIC has raised sufficient questions of fact regarding Wipe New as a trade secret and whether Rust-Oleum misappropriated it.**

Plaintiff Rust-Oleum claims it is entitled to summary judgement on Defendant NIC's counterclaim for misappropriation of trade secrets because Wipe New's formula is not a trade secret and Rust-Oleum's actions do not constitute misappropriation.

"Trade secret" refers to information that derives independent economic value from not being generally known to the public and is likewise subjected to reasonable efforts to maintain its secrecy. ORS 646.461(4). Disclosure or use of a trade secret by a person who acquired the knowledge through improper means and lacks consent is misappropriation. ORS 646.461(2).

Rust-Oleum alleges that information about the Wipe New formula, as well as its particular application of Durazane, is publicly available and generally known in the industry. Rust-Oleum points to EMD's website wherein sample formulas are posted to instruct consumers on Durazane's uses. NIC argues in response that Wipe New's formula and use of Durazane for wipe-on application was not publicly known at the time the Sales Agreement was signed. NIC highlights that Rust-Oleum has not produced evidence for the record that anyone sold a formula for restorative use like Wipe New. NIC explains that the Durazane "starter formulas" publicly available on EMD's website are chemically different from Wipe New's particular formula. NIC further states that Rust-Oleum is precluded from disputing Wipe New is a trade secret based on its own acknowledgements in the Sales Agreement. In Section 13.1, Rust-Oleum warranted that it understood Wipe New, the formula, and the design "constitute[] trade secrets of NIC." NIC has demonstrated a genuine issue of fact as to whether Wipe New is a trade secret.

Rust-Oleum also claims it could not have misappropriated because Wipe New is not a trade secret and regardless, Rust-Oleum had a proper purpose in reverse engineering the product. Rust-Oleum argues it was forced to reverse engineer in order to determine compliance with various regulations. NIC responds by again pointing to the Sales Agreement. Section 13.1 also

obligated Rust-Oleum not to "disclose, duplicate [or] reverse engineer the Product." Rust-Oleum

nonetheless launched "Operation Torpedo" with the objective of producing a Wipe New

duplicate and succeeded. NIC argues that reverse engineering was a direct violation of the Sales

Agreement and therefore, conclusively misappropriation. NIC has demonstrated a genuine issue

of fact as to whether Rust-Oleum misappropriated.

Rust-Oleum is therefore not entitled to summary judgment on NIC's counterclaim for

misappropriation of trade secrets.

> **c. Rust-Oleum is not entitled to summary judgment on NIC's third counterclaim (fraud) because NIC has raised a genuine dispute regarding whether the claim has a basis independent from the misappropriation claim.**

Plaintiff Rust-Oleum claims Defendant NIC's fraud counterclaim is preempted by the

Oregon Trade Secrets Act. The Oregon Trade Secrets Act supersedes conflicting tort law

providing civil remedies for misappropriation of a trade secret. ORS 646.473(1). It does not

affect civil remedies not based on misappropriation of a trade secret. ORS 646.473(2). "Where

the essence of the claim relates primarily to the alleged misappropriation of a trade secret, the

claim is displaced by the preemptive language of the Act." *Acrymed, Inc. v. Convatec*, 317 F.

Supp. 2d 1204, 1217 (D. Or. 2004).

NIC alleges Rust-Oleum committed fraud in connection to the Settlement Agreement by

representing it had not and would not reverse engineer Wipe New. Rust-Oleum executed the

Settlement Agreement knowing such representations were false. NIC claims it believed Rust-

Oleum would resume purchases once it exhausted its inventory. NIC claims it refrained from

selling Wipe New to others and delayed reentry to the market in reliance on Rust-Oleum's

representations.

Rust-Oleum claims that the essence of NIC's fraud claim is misappropriation of trade secrets. Rust-Oleum argues that without the misappropriation, there would be no damages and no claim for fraud. Thus, because the claims are co-dependent, the fraud claim is preempted by the OTSA.

NIC disagrees, arguing that misappropriation simply provides a motive for the allegations contained in NIC's Answer. NIC contends its fraud claim is based on Rust-Oleum's representations that it would resume purchases once its inventory was exhausted. NIC claims that in reliance on this promise, NIC did not reenter the market until 2018. The claims are independent, according to NIC, because NIC does not need to prove Rust-Oleum misappropriated its trade secrets to prevail on the fraud claim. Thus, no preemption should apply.

NIC has raised a genuine dispute as to whether its fraud claim has an independent basis from the alleged trade secret misappropriation. Rust-Oleum is not entitled to judgement as a matter of law on NIC's counterclaim for fraud.

## CONCLUSION

For the above reasons, Defendant NIC's motion for summary judgment (#199) is GRANTED and Plaintiff Rust-Oleum's motion for summary judgment (#202) is DENIED. NIC is entitled to judgment as a matter of law on Rust-Oleum's claims for fraud in the inducement, breach of contract, declaratory judgment, and breach of the implied duty of good faith and fair dealing.

The issues remaining for trial concern whether Rust-Oleum breached the Agreements and violated trade secrets law by reverse engineering and duplicating NIC's Wipe New formula. Rust-Oleum contends it "used...information EMD provided...entirely independent of NIC, to develop separate Wipe New product formulations that Rust-Oleum referred to as the 'Wipe New

Offset.'" Rust-Oleum argues this absolves it of any contract or trade secret violations. Any

injunctive relief and corresponding damages resulting from such alleged violations will be

determined at trial.

DATED this 23 day of _____October_____ , 2023.

MARK D. CLARKE
United States Magistrate Judge