IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**RUST-OLEUM CORPORATION,**

Plaintiff / Counter Defendant,

v.

**NIC INDUSTRIES, INC.,**

Defendant / Counter Claimant.

Case No. 1:18-cv-01655-CL

**OPINION AND ORDER**

**CLARKE,** Magistrate Judge.

Before the Court for consideration are the objections of Rust-Oleum to the proposed form of judgment, following a jury verdict in favor of NIC.

For the reasons below, the Court sustains Rust-Oleum's objection as to the damages awarded on the claim for fraud. NIC may accept remittitur on this claim, reducing the amount of compensatory damages and punitive damages, or request a new trial as to these damages. Rust-Oleum's remaining objections are overruled. Judgment shall be entered in the amounts awarded by the jury for the breach of contract claim and the misappropriation of trade secrets claim. NIC is also entitled to prejudgment interest on all compensatory damages awarded, dating back to a date certain of August 1, 2018.

## BACKGROUND

Rust-Oleum Corporation, a division of RPM International, manufactures its own line of paints, stains, and coatings. NIC Industries manufactures powder coatings and ceramic polymer coatings through its divisions, Prismatic Powders and Cerakote.

In 2012 and 2013, NIC, working together with another entity known as Avento, began developing a formula for a product that was eventually named "Wipe New," which could be wiped onto faded automotive trim to restore a new-like appearance. Avento created another company called Showroom in order to keep the identities of the parties and the formula secret as the product developed and began to be produced. NIC retained ownership of the proprietary rights and information to the secret formula, and Showroom owned the Wipe New brand name. Neither Avento nor Showroom knew what was in the formula, and NIC agreed not to sell it to anyone else in a wipe-on application. Eventually Showroom became "Wipe New LLC," ("LLC"), and the parties' agreement was replaced by a Limited Exclusive Sales Agreement between NIC and LLC, which included terms for a minimum purchase requirement.

Rust-Oleum began negotiations with LLC in September of 2014, expressing an interest in acquiring a license to the Wipe New brand name and rights to the Sales Agreement with NIC. By the time negotiations were finalized, the Sales Agreement contained the following key provisions:

> **1. Grant of Exclusive Right to Purchase.** NIC hereby agrees that during the term of this Agreement...it will not sell or otherwise distribute the Product to any other persons or entities...which are known or suspected by NIC to use the Product for use in the Covered Application. NIC shall retain the right to sell the Product and all other NIC products to other purchasers...during the term of this Agreement, provided that such purchasers are not actually known by NIC to be engaged in the Covered Application as of the date of this Agreement. ... NIC will use commercially reasonable efforts to track the end uses of the Product.

> **8.1 Representations and Warranties of NIC.** NIC warrants that it owns the Product technology and has the right to sell the Products to Wipe New under the terms of this Agreement.
>
> **13.1 Confidentiality Regarding NIC Products.** Wipe New acknowledges and agrees that NIC is the owner of all proprietary rights in NIC products, including but not limited to information regarding the Product and the formulas, design or manufacture of such products…and that such information constitutes trade secrets of NIC. Wipe New is not granted any right to use, disclose, duplicate (including but not limited to reverse engineering and/or efforts to reverse engineer the Product) license, sell or reveal any portion of the Confidential Information.

"Product" is defined as AV-945, "the moisture-curable silicon-based polymer used in Wipe New products." The "Covered Application" refers to the Product being used as "a wipe on application for vehicle restoration, detailing, and general home use."

From 2014 to 2016 Rust-Oleum performed three rounds of Fourier Transform Infrared Spectroscopy ("FTIR") and Gas Chromatography Mass Spectrometry ("GCMS"). FTIR and GCMS are techniques that utilize infrared rays and vaporization to identify substances within a sample. The first few rounds were inconclusive, according to Rust-Oleum. Lead chemist, Dr. Haewon Uhm, Ph.D., testified to having independent familiarity with the secret key ingredient in NIC's formula, which led her to the conclusion that that ingredient and Wipe New share similar properties. She claims to have incorporated a sample of the ingredient from another company, EMD, into FTIR tests in March 2016, which conclusively established that the ingredient was the secret ingredient in NIC's Wipe New formula. Rust-Oleum's development team subsequently launched "Project Torpedo" with the objective of "develop[ing] a formulation that will perform equal to the current Wipe New Original formulation."

By late 2017, Rust-Oleum told NIC it could no longer meet minimum purchase expectations. Rust-Oleum and NIC entered into the Mutual Settlement Agreement on November

27, 2017, ending their exclusive sales relationship. The Settlement Agreement contained the following key provisions:

> **2. Mutual Release.** Except for the obligations of the parties under this Release, each of the parties hereby releases, acquits, and forever discharges each other…from any and all claims, demands, claims for relief (whether in contract, tort, or equity), costs, damages, attorney fees, liability and expense of any nature, known or unknown, suspected or unsuspected, in any matter related to, or arising out of the Agreement through the effective date of this Release.
>
> **3. Continuing Obligations of RO.** Notwithstanding the termination of the Agreement…RO will continue to remain obligated with respect to Sections 6 (Restriction on Resale of the Product), 9 (Intellectual Property), 11 (Disclaimer of Warranties; Limitation of Liability), 12 (Indemnification; Insurance), and 13 (Confidentiality) of the Agreement. RO hereby represents and warrants to NIC that it has complied fully with each and every one of such obligations up to and including the Effective Date of this Release, and that RO will continue to comply fully with each and every one of such obligations thereafter.

At trial, NIC's president, Brian Hall, testified that, based on the representations made in the Settlement Agreement, NIC decided not to enter the market with their own version of Wipe New, using their key ingredient. NIC believed that if Rust-Oleum had not reverse-engineered the product, as promised, eventually Rust-Oleum would need to buy more of the product from NIC to continue selling Wipe New. NIC's one-year delay of entry into the market with their own product is the basis for NIC's claimed compensatory damages for fraud.

In August 2018, NIC learned Rust-Oleum was still selling Wipe New after its supply from NIC should have been exhausted. NIC served Rust-Oleum with a Cease-and-Desist letter on August 24, 2018. Rust-Oleum filed this lawsuit on September 12, 2018.

**PROCEDURAL BACKGROUND**

Rust-Oleum's lawsuit contained contract and fraud claims, alleging that NIC misrepresented proprietary rights and exclusivity in the Sales Agreement, thereby fraudulently inducing Rust-Oleum's assent to the Sales and Settlement Agreements. NIC filed counterclaims for breach of contract, trade secret violations, and fraud, arising out of the reverse engineering and product duplication performed by Rust-Oleum.

Summary judgment was granted to NIC on all of Rust-Oleum's claims, except the claim for declaratory judgment. Summary judgment was denied as to NIC's claims against Rust-Oleum. On September 17, 2024, the Court held a two-week jury trial in Medford, Oregon, as to the remaining claims: breach of contract, statutory misappropriation of trade secrets, and fraud. A verdict was rendered for NIC on all claims on September 27, 2024, awarding compensatory damages for all three claims, as well as punitive damages on all three claims. NIC proposed a form of judgment, Rust-Oleum objected, and the parties briefed the objections. Oral argument was heard on these issues on January 14, 2025.

## DISCUSSION

Rust-Oleum makes three main objections to the proposed judgment. First, Rust-Oleum objects to the amount of damages awarded for NIC's fraud claim. Second, Rust-Oleum objects to the award of damages for both the breach of contract claim and the misappropriation of trade secrets claim; Rust-Oleum asserts that the damages for these two claims are duplicative. Third, Rust-Oluem objects to the Court awarding NIC prejudgment interest on any of the damages awarded. For the reasons below, the Court sustains Rust-Oleum's objection as to the fraud damages and overrules the other two objections.

**I.     The damages for fraud must be reduced because the jury's award was excessive and not based on evidence.**

In the Ninth Circuit, in reviewing a jury's damages award, the district court must uphold the jury's finding of the amount of damages "unless the amount is 'grossly excessive or monstrous,' clearly not supported by the evidence, or 'only based on speculation or guesswork.'" *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984). When reviewing a claim of excessive damages, a district court, after viewing the evidence in a light most favorable to the prevailing party, determines that the damages award is excessive, it has two alternatives: it may grant the motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur. *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983). The prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damages which the court considers justified. *Id.* The standard to be applied by the trial court in remitting a judgment is the maximum amount sustainable by proof. *D. & S. Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982). This rule prevents the Court's substitution of its judgment for that of the jury. *Bonura v. CSEA Land Service, Inc.*, 505 F.2d 665, 669 (5th Cir. 1974); *see also, Informatica Corp. v. Business Objects Data Integration, Inc.*, 2007 WL 2344962, at *4 (N.D. Cal. Aug. 16, 2007).

Here, the jury was instructed as follows:

> If you find that NIC has proved the elements of fraud by clear and convincing evidence, you must next consider the issue of NIC's damages.
>
> NIC alleges that Rust-Oleum's fraud caused NIC to delay entry into the market with their own product, causing them damages. NIC must prove these damages by a preponderance of the evidence.

At trial, NIC relied on the testimony of their expert, Dr. John Williams, who opined that NIC's on-year delayed entry into the market caused $3,610,814 in fraud damages. NIC submitted into evidence Dr. William's expert report and summary slides stating that same amount. In

closing argument, NIC's counsel asked the jury to award compensatory damages for NIC's fraud claim for this amount. However, the jury awarded $30 million to NIC for the fraud claim, nearly ten times the amount requested by NIC. The Court agrees with Rust-Oleum that this amount is excessive and not supported by the evidence.

The Court finds the maximum amount of damages sustainable by proof on the fraud claim is $3,610,814. NIC may either accept a remittitur of $3,610,814 or request a new trial as to these damages. The Court also notes that the jury unanimously found liability on the fraud claim, and the question of damages can be evaluated separately without disturbing the jury's finding as to liability. Thus, if NIC rejects the remittitur, any new trial on the fraud claim would be limited to damages.

Additionally, and for the same reason, the jury's award of punitive damages must be reduced. The jury awarded NIC $60 million for punitive damages as to the fraud claim, which was twice the amount awarded in compensatory damages. Therefore, the Court finds that the punitive damages award should be reduced in proportion to the reduction of compensatory damages. Twice the amount of compensatory damages, as remitted, would be $7,221,628, and the Court finds that this amount gives effect to the jury's intent without running afoul of fairness or due process concerns. NIC may accept this amount or request a new trial.

**II.    Judgment will be entered for NIC on both the breach of contract and the misappropriation claims, with the damages as awarded by the jury.**

The jury found Rust-Oleum liable for breach of contract and misappropriation of NIC's trade secrets. The jury awarded $40 million in damages for the breach of contract claim and $20 million in damages for misappropriation claim. Rust-Oleum objects and requests that the Court require NIC to elect only one of these amounts to recover, arguing that, otherwise, the verdict results in an impermissible double recovery for the same harm. The Court disagrees.

Page 7 – Opinion and Order

### A. The damages awarded by the jury are not duplicative.

"The general rule of compensatory damages bars double recovery for the same wrong." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1005-06 (9th Cir. 2008) (internal citation omitted). A "prevailing plaintiff may not recover tort damages and contract damages for the same wrong, even though the plaintiff might have set forth alternate theories of recovery." *Ambassador Hotel Co. v. Wei-Chuan Invest*, 189 F.3d 1017, 1031-32 (9th Cir. 1999).

However, the Seventh Amendment to the Constitution guarantees that no fact tried to a jury shall be otherwise re-examined in any court of the United States except according to the rules of common law. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1038 (9th Cir. 2003) (quoting *Gallick v. Baltimore & O.R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618, (1963); *Zhu v. Li*, 2023 WL 4772338 (July 26, 2023 N.D. Cal.). The court must accept any reasonable interpretation of the jury's findings, reconciling the jury's findings "by exegesis if necessary." *Gallick*, 372 U.S. at 119; *Zhang*, 339 F.3d. at 1038. A party bears a high burden to establish an irreconcilable inconsistency, or, in this case, an intent to award duplicate damages. *Zhang* at 1038.

In *Zhu*, the jury awarded plaintiff $357,761.87 in damages for an intentional misrepresentation claim and $971,316.91 for a breach of fiduciary duty claim arising from the same sale transaction. *Id.* at*3. The defendant, like Rust-Oleum here, argued the verdict resulted in double recovery. *Id.* The court determined from the record that the claims were intended to compensate for the same economic harm. *Id.* However, the court held that it had a duty under the Seventh Amendment to harmonize the jury's verdict with the law if it was possible under a fair reading of the verdict and the jury instructions. *Id.* at *3-4. The court found that the jury instructions authorized the jury to award damages on each of plaintiff's claims. *Id.* at *3-4. The

verdict form also asked the jury to identify the amount of damages in connection with each claim. *Id.* at *4 The verdict form did not caution against duplicative damages or instruct that an award of damages on one claim precluded an award on the other.

The court in *Zhu* found that it was reasonable to conclude that the jury awarded total damages and simply allocated a portion of the total to each claim:

> There is nothing in the record suggesting that the jury intended the awards for each claim to constitute total separate damages for each claim (as Defendants' suggest), as opposed to partial damages that would later be aggregated to compensate for the single harm caused by the Defendants' misrepresentation....

*Id.* at *4. The court found that the total amount of damages the jury awarded on the two claims was a little less than, but close to the total amount of damages testified to by plaintiff's expert. *Id.*

This approach to resolving double damages assertions is consistent with Oregon law. *See Kilgore v. People's Sav. & Loan Ass'n,* 107 Or. App. 743, 814 P.2d 163 (1991), *rev. dismissed,* 313 Or. 300, 832 P.2d 546 (1992); *Howmar Materials Inc. v. Peterson,* 174 Or. App. 55, 23 P.3d 409 (2001). In *Kilgore*, the plaintiff filed an action against a landlord for wrongful death caused by a fire at a residence. The plaintiff asserted claims for negligence and violation of the Oregon Landlord Tenant Act (RLTA), claiming liability based upon the absence of operable smoke detectors in the home. 107 Or. App. at 745-747. The jury made separate awards of damages on the negligence claim and the RLTA claim. *Id.* at n. 9. The verdict was received without objection. The awards for general damages and emotional distress damages under each claim were identical. *Id.* However the jury awarded special damages of $2000 on one claim and $1800 on the other. When plaintiff submitted the judgment based on the verdict, defendant objected arguing the awards constituted double recovery. The court rejected that position because the defendant did not make its position clear to the jury by submitting an instruction that an award

Page 9 – Opinion and Order

on one claim would preclude a finding of damages on the other. *Id.* at 752-753. The court also ruled that the jury could reasonably allocate damages to each claim and appeared to have done so by awarding different amounts for special damages on each claim. *Id.* at n. 10.

Similarly, in *Howmar*, the plaintiffs sought to recover damages on a claim for fraudulent misrepresentation and fraudulent concealment. The jury awarded damages on each claim and defendant objected. The court held that it could refuse to give effect to the jury verdict only if it could say as a matter of law that there was duplication of damages. 174 Or. App. at 58. The court then let the verdict stand, finding that the total awarded on both claims did not exceed the total damages that the evidence would allow. The court cited *Kilgore* for the proposition that "a jury could reasonably allocate damages for the same loss between two claims for relief." *Id* at 59.

By contrast, in *Long v. Gill*, cited by Rust-Oleum, the court made no finding regarding the evidence presented at trial as to damages, nor did the court address whether the jury could have intended to award both amounts and have them aggregated for a single harm. *Long v. Gill*, 2014 WL 3512507, at *1 (D. Or. July 10, 2014), aff'd, 690 F. App'x 936 (9th Cir. 2017). The Court did not note whether or not the jury had been instructed as to duplicative damages, but it specifically found that "the jury awarded duplicative damage awards." *Id.*

Here, as in all of the cases cited above, NIC sought to recover through two distinct legal theories, which arose out of the same set of operative facts, for a single alleged injury. NIC alleged that Rust-Oleum reverse-engineered NIC's formula, which was a breach of the contract and also constituted a violation of the trade secrets statute. The damages models presented to the jury for each of these two claims were generally the same: the fair market value of the formula or NIC's lost profits.[1] The jury was instructed that these were alternative measures of damages.

---

[1] The jury was also told that, at a minimum, misappropriation of a trade secret entitled NIC to a "reasonable royalty."

NIC's expert witness, Dr. John Williams, provided several different potential total damages amounts based on these different models. Based on one of the models, using the income approach and a 20% market capture, Dr. Williams testified that the damages caused by loss of the trade secret formulas was $64,991,460. NIC Ex. 360A p. 28; Trial Tr. at 1199-1200. The jury awarded $40 million for breach and $20 million for misappropriation, which, if aggregated is $60,000,000 total, well within a reasonable range of the $64,991,460 testified to by Dr. Williams. Thus, as in the *Zhu* case, the total amount of damages awarded on the two claims in this case was a little less than, but close to the total amount of damages testified to by NIC's expert.

Moreover, as in the *Zhu* case, nothing in the record suggests that the jury intended the awards for each claim to constitute total separate damages for each claim as opposed to partial damages that would later be aggregated to compensate for the single harm. Here, as in *Zhu*, *Kilgore*, and *Howmar*, the jury was not instructed as to "duplicative damages," and Rust-Oleum did not request any such instruction. In particular, as in the *Kilgore* case, Rust-Oleum did not make its position clear to the jury by submitting an instruction that an award on one claim would preclude a finding of damages on the other claim. Unlike the *Long v. Gill* case therefore, here, the Court cannot affirmatively state that the jury clearly awarded duplicative damages.

For all of these reasons, Rust-Oleum's objection to the judgment is overruled, and the request to require NIC to elect their preferred remedy is denied.

### B. Rust-Oleum waived this objection by failing to object to the verdict form and by failing to object to the verdict or request that the jury be questioned as to the intention to aggregate the damages for breach and misappropriation.

Rust-Oleum's objection is overruled for a second reason. In addition to not requesting a jury instruction as to duplicative damages or election of remedies, Rust-Oleum failed to object to

the verdict, both at the time the verdict form was created and at the time the verdict was rendered by the jury.

At the time of creation of the verdict form, Rust-Oleum did propose different questions, and some of those questions contained more detail as to the types of damages being awarded. However, the questions that Rust-Oleum proposed would not have solved the issue of potential partial awards being given by the jury for each claim with the intent to aggregate. Specifically, with respect to NIC's misappropriation of trade secrets claim, Rust-Oleum proposed that the verdict form provide separate lines for the jury to state the dollar amount of lost profits, unjust enrichment, and the reasonable royalty that were proven. Rust-Oleum does not explain how this proposal would have avoided the problem asserted here, which is an issue of potential duplication between claims, not an issue of potential duplication within a single claim. In other words, Rust-Oleum has not asserted that the $20 million awarded for misappropriation unfairly compensates NIC for both the value of the formula and the value of NIC's lost profits and/ or the value of a reasonable royalty. Such an argument would be unavailing, as the jury was instructed that these were alternative measures of damages. Thus, Rust-Oleum's argument regarding its version of a proposed verdict for is inapposite. No objection was made regarding the intention or ability of the jury to award damages for both breach of contract and misappropriation, nor was a request made to add a clarifying question about aggregation of those two numbers or to include a line for a total amount of damages to be awarded for all of the claims.

Rust-Oleum also failed to request that the jury be questioned regarding their intent to aggregate or not, prior to being released as jurors. *See Home Indem. Co. v. Lane Powell Moss and Miller,* 43 F.3d 1322, 1331 (9th. Cir. 1995) ("We conclude that the district court properly refused to amend the judgment because Home waived its objection to the jury's verdict on its

contribution claim by not objecting to the alleged inconsistency prior to dismissal of the jury"); *Pierce v. Southern Pacific Transp. Co.*, 823 F.2d 1366, 1370, (9th Cir. 1987); *El-Hakem v. BJY Inc.*, 262 F. Supp. 2d 1139, 1145 and 1153, (D. Or. 2003), aff'd, 415 F.3d 1068 (9th Cir. 2005); *see also Smith v. J.C. Penney Co.*, 269 Or. 643, 652-653 (525 P.2d 1299 (1974) (Issues with the verdict must be addressed before jury is discharged or they are waived).

Here, at the time of the jury's verdict, the Court asked whether either party wanted to poll the jury, and both parties declined. The Court then excused the jury, but asked them to wait for him in the jury room. The Court asked the parties whether there were any further issues, and there was a clear opportunity for Rust-Oleum to request any additional clarification from the jury prior to them being fully excused from the case. Rust-Oleum chose not to do so. Therefore, the Court declines to amend the judgment for the additional and separate reason that Rust-Oleum failed to raise the issue and clarify the jury's intent at the time of the verdict. This issue has been waived. NIC is entitled to both damages awards.

### III.    NIC is entitled to prejudgment interest.

State law governs the award of prejudgment interest in diversity cases because prejudgment interest is a substantive component of a claim for damages. *In re Cardelucci*, 285 F.3d 1231, 1235 (9th Cir. 2002). In the absence of an agreed-upon contractual provision allowing prejudgment interest, the issue is governed by ORS 82.010 which provides that interest begins to accrue on "all moneys after they become due" at the rate of nine percent per annum.

In Oregon, prejudgment interest is added to the principal and forms part of the money award on which post-judgment interest is calculated. ORS 82.010(2); *Ramis Crew Corrigan & Bachrach, LLP v. Stoelk*, 193 Or. App. 700, 709-10, 92 P.3d 154 (2004) (statute imposes mandatory requirement that post-judgment interest accrues on prejudgment interest). "Statutory

Page 13 – Opinion and Order

prejudgment interest must be determined by the court after trial, not by the jury." *Acradyne Corp. v. Euro-Herramientas, S.A.U.*, 2007 WL 128996 (D. Or. 2007); *Web Analytics Demystified, Inc. v. Keystone Solutions*, LLC, 2015 WL 13858604 (D. Or. 2015) (where prejudgment interest is sought under ORS 82.010, as opposed to contract, trial court, not jury, decides issue). In making this determination, a court will award prejudgment interest when: (1) the amount owing is ascertainable by simple computation or by reference to generally recognized standards; and (2) the time from which interest should run is easily ascertainable. *State v. Holm II, Inc.*, 185 Or. App. 182, 192, 59 P.3d 1280 (2002).

The "readily ascertainable" inquiry includes the benefit of post-verdict hindsight: "[W]e do not operate from the perspective of the parties during litigation but from an objective, post-judgment perspective." *JH Kelly, LLC v. Quality Plus Servs., Inc.*, 305 Or. App. 565, 589–90, 472 P.3d 280, 295–96 (2020) (quoting *L. H. Morris Electric v. Hyundai Semiconductor*, 203 Or. App. 54, 78, 125 P.3d 1 (2005), rev. den., 341 Or. 140, 139 P.3d 258 (2006)). This is because, if a duty to pay occurs, whether based on a breach of contract or violation of a statute, litigation "may be necessary to determine that the duty to pay or return money has been breached[,] [b]ut if a Plaintiff prevails in such an action, the breach does not occur at the time of judgment. It is, instead, a past event." *See Strawn v. Farmers Ins. Co. of Oregon*, 353 Or. 210, 240, 297 P.3d 439, 457 (2013). "Once due, the debtor has the use of money to which the debtor is not entitled, while the delay in payment deprives the creditor of that use." *Id.* at 241 (citation omitted).

Here, the jury found that Rust-Oleum breached the contract and misappropriated NIC's trade secret. These were actions that cost NIC specific amounts of money at the time of the breach. The trade secret had value at the time that it was misappropriated. The jury was able to ascertain and award that value in compensatory damages. While Rust-Oleum disputed the fact

that the breach and misappropriation took place, it did not offer any evidence to contradict the timing alleged by NIC, which was that the breach and misappropriation happened, at the latest, on August 1, 2018. There was significant evidence at trial that much of the reverse-engineering of the formula at issue took place prior to this date. Rust-Oleum therefore gained the value of the trade secret on August 1, 2018, NIC has been deprived of this value, and Rust-Oleum has been able to retain that amount, for all of the intervening years. In order to make NIC whole, NIC is entitled to prejudgment interest dating back to August 1, 2018.

Similarly, the jury found Rust-Oleum liable for fraud, and NIC submitted evidence that a compensatory amount of damages for that fraud was readily ascertainable as of August 18, 2018. This is made clear by Rust-Oleum's motion on the fraud damages and the Court's agreement to remit the amount to the conform to the evidence. Therefore, NIC is entitled to prejudgment interest as to the remitted amount of compensatory damages.

Rust-Oleum contends that the jury may have already awarded prejudgment interest in the compensatory damages calculations. There is scant evidence for this proposition. Dr. Williams, NIC's expert on damages did include consideration of prejudgment interest in one of his calculations, on one single table, but on all of the rest of the slides and tables these amounts were omitted. The jury was not instructed as to prejudgment interest, and the parties did not object or request to ask the jury if they considered prejudgment interest at the time of the verdict. For these reasons, the Court does not consider the jury to have awarded prejudgment interest.

## ORDER

For the reasons above, Rust-Oleum's motion to amend the judgment to reduce the damages awarded by the jury for fraud is GRANTED. NIC may accept remittitur on this claim, reducing the amount of compensatory damages to $3,610,814 and reducing the punitive damages

award to twice that amount, or NIC may request a new trial as to these damages. NIC shall file a notice with the Court by **Friday, January 31, 2025,** stating that the remitted damages are accepted, or that they are rejected and a new trial on damages is requested.

Rust-Oleum's motion as to the remaining objections is DENIED. NIC is entitled to the damages awarded by the jury for both breach of contract and misappropriation. NIC is entitled to prejudgment interest on all of the compensatory damages awarded, in the amount of 9 percent per annum, beginning on August 1, 2018.

Judgment shall be entered as discussed above on Monday, February 3, 2025, pending NIC's acceptance of the remitted damages for fraud.

It is so ORDERED and DATED this 28 day of January, 2025.

MARK D. CLARKE
United States Magistrate Judge