IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**RUST-OLEUM CORPORATION,**    Case No. 1:18-cv-01655-CL

Plaintiff / Counter Defendant,

**OPINION AND ORDER**

v.

**NIC INDUSTRIES, INC.,**

Defendant / Counter Claimant.

---

**CLARKE**, Magistrate Judge.

Before the Court for consideration is Rust-Oleum's motion for Judgment as a Matter of Law (JMOL) or alternatively, Motion for a New Trial (ECF #412). Many of the issues raised in this motion have already been addressed by this Court, at summary judgment, then again at trial, and finally in the Court's recent Opinion and Order regarding the judgment in this case (ECF #387). The Court will address each of the issues raised by Rust-Oleum below. However, based on the verdict and the damages awarded, the jury clearly found that the evidence presented at trial overwhelmingly supported finding Rust-Oleum liable for its willful and malicious misconduct in this case. None of the issues and potential errors raised by Rust-Oleum in this motion, even if granted, would change that substantive outcome. Rust-Oleum's motion (ECF #412) is denied in its entirety.

# BACKGROUND

Rust-Oleum Corporation, ("Rust-Oleum") manufactures its own line of paints, stains, and coatings. NIC Industries ("NIC") manufactures powder coatings and ceramic polymer coatings through its divisions, Prismatic Powders and Cerakote.

In 2012 and 2013, NIC, working together with another entity known as Avento, began developing a formula for a product that was eventually named "Wipe New," which could be wiped onto faded automotive trim to restore a new-like appearance. Avento created another company called Showroom in order to keep the identities of the parties and the formula secret as the product developed and began to be produced. NIC retained ownership of the proprietary rights and information to the secret formula, and Showroom owned the Wipe New brand name. Neither Avento nor Showroom knew what was in the formula, and NIC agreed not to sell it to anyone else in a wipe-on application. Eventually Showroom became "Wipe New LLC," ("LLC"), and the parties' agreement was replaced by a Limited Exclusive Sales Agreement (the "Sales Agreement") between NIC and LLC, which included terms for a minimum purchase requirement.

Rust-Oleum began negotiations with LLC in September of 2014, expressing an interest in acquiring a license to the Wipe New brand name and rights to the Sales Agreement with NIC. By the time negotiations were finalized, the Sales Agreement contained the following key provisions:

> **1. Grant of Exclusive Right to Purchase.** NIC hereby agrees that during the term of this Agreement...it will not sell or otherwise distribute the Product to any other persons or entities...which are known or suspected by NIC to use the Product for use in the Covered Application. NIC shall retain the right to sell the Product and all other NIC products to other purchasers...during the term of this Agreement, provided that such purchasers are not actually known by NIC to be engaged in the Covered Application as of the date of

this Agreement. ... NIC will use commercially reasonable efforts to track the end uses of the Product.

**8.1 Representations and Warranties of NIC.** NIC warrants that it owns the Product technology and has the right to sell the Products to Wipe New under the terms of this Agreement.

**13.1 Confidentiality Regarding NIC Products.** Wipe New acknowledges and agrees that NIC is the owner of all proprietary rights in NIC products, including but not limited to information regarding the Product and the formulas, design or manufacture of such products...and that such information constitutes trade secrets of NIC. Wipe New is not granted any right to use, disclose, duplicate (including but not limited to reverse engineering and/or efforts to reverse engineer the Product) license, sell or reveal any portion of the Confidential Information.

"Product" is defined as AV-945, "the moisture-curable silicon-based polymer used in Wipe New products." The "Covered Application" refers to the Product being used as "a wipe on application for vehicle restoration, detailing, and general home use."

Despite contractually agreeing not to reverse-engineer the formula, from 2014 to 2016 Rust-Oleum performed three rounds of Fourier Transform Infrared Spectroscopy ("FTIR") and Gas Chromatography Mass Spectrometry ("GCMS"). FTIR and GCMS are techniques that utilize infrared rays and vaporization to identify substances within a sample. The first few rounds were inconclusive, according to Rust-Oleum. Lead chemist, Dr. Haewon Uhm, Ph.D., testified at trial to having independent familiarity with a specific resin, which led her to the conclusion that the resin[1] and Wipe New share similar properties. Uhm Tr. 608-609 (ECF #360). She claimed to have incorporated a sample of the ingredient from another company, EMD, into FTIR tests in March 2016, which conclusively established that the resin was the secret ingredient in NIC's Wipe New formula. Rust-Oleum's development team subsequently launched "Project Torpedo"

---

[1] The specific resin was named in the proceedings, and can be found in prior Court filings, but the name will be omitted in this Opinion to avoid the need to file it under seal.

with the objective of "develop[ing] a formulation that will perform equal to the current Wipe New Original formulation." Ferguson Tr. 846 (ECF #361); Uhm Tr. 640 (ECF #360).

By late 2017, Rust-Oleum told NIC it could no longer meet minimum purchase expectations. At trial, NIC's president, Brian Hall testified that his contact at Rust-Oleum, Lisa Stach, represented to him that Rust-Oleum would purchase more Wipe New formula from NIC once it had worked through its backlog of inventory of the product. Hall Tr. 496-97 (ECF #360). He paraphrased her comments as saying, "Look, Brian, we can't meet our minimum purchase requirements, but we're just going to buy what the market requires." This created the implication that it was simply a supply and demand problem, not that Rust-Oleum could create its own supply of the product.

Rust-Oleum and NIC entered into the Mutual Settlement Agreement on November 27, 2017, ending their exclusive sales relationship. The Settlement Agreement contained the following key provisions:

> **2. Mutual Release.** Except for the obligations of the parties under this Release, each of the parties hereby releases, acquits, and forever discharges each other...from any and all claims, demands, claims for relief (whether in contract, tort, or equity), costs, damages, attorney fees, liability and expense of any nature, known or unknown, suspected or unsuspected, in any matter related to, or arising out of the Agreement through the effective date of this Release.
>
> **3. Continuing Obligations of RO.** Notwithstanding the termination of the Agreement...RO will continue to remain obligated with respect to Sections 6 (Restriction on Resale of the Product), 9 (Intellectual Property), 11 (Disclaimer of Warranties; Limitation of Liability), 12 (Indemnification; Insurance), and 13 (Confidentiality) of the Agreement. RO hereby represents and warrants to NIC that it has complied fully with each and every one of such obligations up to and including the Effective Date of this Release, and that RO will continue to comply fully with each and every one of such obligations thereafter.

Brian Hall testified that, based on the representations made in the Settlement Agreement that Rust-Oleum had not and would not reverse-engineer NIC's formula, and the representations of Lisa Stach that Rust-Oleum would buy from NIC "what the market requires," NIC decided not to enter the market with their own version of Wipe New, using their key ingredient. NIC argued at trial that his reliance was reasonable because Rust-Oleum continued to provide NIC with sales forecasts after 2017. Tr. 498. NIC believed that if Rust-Oleum had not reverse-engineered the product, as promised, eventually Rust-Oleum would need to buy more of the product from NIC to continue selling Wipe New. NIC's one-year delay of entry into the market with their own product is the basis for NIC's claimed compensatory damages for fraud.

In August 2018, NIC learned Rust-Oleum was still selling Wipe New after its supply from NIC should have been exhausted. NIC served Rust-Oleum with a Cease-and-Desist letter on August 24, 2018. Rust-Oleum filed this lawsuit on September 12, 2018.

<b>PROCEDURAL BACKGROUND</b>

Rust-Oleum's lawsuit contained contract and fraud claims, alleging that NIC misrepresented proprietary rights and exclusivity in the Sales Agreement, thereby fraudulently inducing Rust-Oleum's assent to the Sales and Settlement Agreements. NIC filed counterclaims for breach of contract, trade secret violations arising out of the reverse engineering and product duplication performed by Rust-Oleum. Later, NIC added the fraud claim.

Summary judgment was granted to NIC on all of Rust-Oleum's claims, except the claim for declaratory judgment. The Court denied Rust-Oleum's Motion for Summary Judgment as to NIC's counterclaims against Rust-Oleum. On September 17, 2024, the Court held a two-week jury trial in Medford, Oregon, on NIC's remaining counterclaims: breach of contract, statutory misappropriation of trade secrets, and fraud. A verdict was rendered for NIC on all claims on

September 27, 2024, awarding compensatory damages for all three claims, as well as punitive damages for misappropriation and fraud. NIC accepted a remittitur as to the damages awarded for fraud, and the Court entered Judgment against Rust-Oleum in the amount of $40 million for the breach of contract claim, $20 million for the trade secret misappropriation, plus $40 million in punitive damages for willful and malicious misappropriation, and $3,610,814.00 for the fraud claim, plus $7,221,628.00 in punitive damages for willful and malicious fraud. The Court also awarded prejudgment interest as to the compensatory damages, and it determined that NIC was entitled to attorney fees and costs.

## LEGAL STANDARD

Under Rule 50(b), judgment as a matter of law should be granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

Under Rule 59(a), a new trial should be granted "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). A court may, for example, grant a new trial when "damages are excessive," *id.* (internal quotation marks omitted), or it "fail[ed] to give adequate instructions," *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).

Under Rule 59(e), a judgment should be amended "to correct manifest errors of law or fact upon which the judgment is based" or to "prevent manifest injustice." *Marsh Aviation Co. v. Hardy Aviation Ins. Inc.*, 720 F. App'x 418, 419 (9th Cir. 2018) (internal quotation marks omitted).

## DISCUSSION

Rust-Oleum's motion for judgment as a matter of law invites the Court to reconsider the

verdict awarded by the jury after two weeks of evidence at trial.  The motion requests the

following relief:

1.  That the Court order NIC to elect its recovery and choose between the damages awarded for breach of contract or misappropriation, but not both.
2.  That the Court grant Rust-Oleum Judgment as a Matter of Law based on the release of claims provided in the Settlement Agreement signed by both parties in 2017.
3.  That the Court grant Rust-Oleum JMOL on the misappropriation claim because Rust-Oleum's conduct did not amount to misappropriation under the law.
4.  That the Court grant Rust-Oleum JMOL on the fraud claim because it impermissibly sounds in contract, not tort.
5.  That the Court grant Rust-Oleum JMOL on damages.
6.  That the Court eliminate or reduce the punitive damage awards.
7.  That the Court grant a new trial based on a prejudicial admission of evidence.
8.  That the Court strike the prejudgment interest awards.

For the reasons below, all of Rust-Oleum's requests for relief are denied.

### I.    Rust-Oleum's motion for election of remedies is denied.

As explained in the Court's prior Opinion and Order (ECF #387), the damages awarded

by the jury for breach of contract and misappropriation are not duplicative.

"The general rule of compensatory damages bars double recovery for the same wrong."

*Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1005-06 (9th Cir. 2008) (internal

citation omitted). A prevailing party "may not recover tort damages and contract damages for the

same wrong, even though the [party] might have set forth alternate theories of recovery."

*Ambassador Hotel Co. v. Wei-Chuan Invest*, 189 F.3d 1017, 1031-32 (9th Cir. 1999).

However, the Seventh Amendment to the Constitution guarantees that no fact tried to a

jury shall be otherwise re-examined in any court of the United States except according to the

rules of common law. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1038 (9th Cir. 2003)

(quoting *Gallick v. Baltimore* & O.R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618,

(1963); *Zhu v. Li*, 2023 WL 4772338 (July 26, 2023 N.D. Cal.). The court must accept any reasonable interpretation of the jury's findings, reconciling the jury's findings "by exegesis if necessary." *Gallick*, 372 U.S. at 119; *Zhang*, 339 F.3d. at 1038. A party bears a high burden to establish an irreconcilable inconsistency, or, in this case, an intent to award duplicate damages. *Zhang* at 1038.

Here, all of the evidence indicates that the jury did not intend to award duplicate damages, but instead it intended that the damages awarded for each claim be aggregated to provide total relief for a single injury. NIC sought to recover through two distinct legal theories, which arose out of the same set of operative facts, for a single alleged injury. NIC alleged that Rust-Oleum reverse-engineered NIC's formula, which was a breach of the contract and also constituted a violation of the trade secrets statute. The damage models presented to the jury for each of these two claims were generally the same: the fair market value of the formula or NIC's lost profits.[2] The jury was instructed that these models were alternative measures of damages.

NIC's expert witness on damages, Dr. John Williams, provided several different potential total damage amounts based on these different models. Based on one of the models, using the income approach and a 20% market capture, Dr. Williams testified that the damages suffered by NIC totaled $64,991,460. NIC Ex. 360A p. 28; Williams Tr. at 1199-1201 (ECF #370) ("I'm going to largely lean towards that middle one, the 20 percent, saying that's definitely where we can get to, is that $64,991,460.").

The jury then awarded $40 million for breach and $20 million for misappropriation, for a total of $60 million for the one single injury – about $5 million less than the total damages most strongly testified to by Dr. Williams. This is direct evidence that the damages for the two claims

---

[2] The jury was also told that, at a minimum, misappropriation of a trade secret entitled NIC to a "reasonable royalty."

were not duplicative. *See Zhu v. Li*, 2023 WL 4772338 (July 26, 2023 N.D. Cal.) (damages for two claims were not duplicative because the jury awarded a little less than, but close to the total amount of damages testified to by an expert.). Rust-Oleum asserts that $60 million is "not even close" to $64,991,460. The Court finds this argument unpersuasive, considering the scale of the numbers in this case. The difference between the two is less than 15%. Additionally, there is no question that a total award for both claims that is nearly $5 million *less* than the total damage number given by an expert cannot be considered "excessive," based on the evidence.

Additionally, nothing in the record suggests that the jury intended the awards for each claim to constitute total separate damages for each claim as opposed to partial damages that would later be aggregated to compensate for the single harm. The jury was not instructed as to "duplicative damages," and Rust-Oleum did not request any such instruction. In particular, Rust-Oleum did not make its position clear to the jury by submitting an instruction that an award on one claim would preclude a finding of damages on the other claim.

Rust-Oleum argues that it sufficiently created a record on this issue by submitting a proposed verdict form that contained extra questions and interrogatories for the jury to answer for each claim. Rust-Oleum argues that the verdict form it proposed would have avoided any potential for damage duplication. The Court disagrees. At trial, Rust-Oleum proposed a verdict form that provided separate lines for the jury to state different dollar amounts for each of the damage models presented –lost profits, unjust enrichment, and the reasonable royalty– that were proven for each claim. This proposal would not have altered the current scenario in any way. The verdict would have contained two sets of numbers for each claim instead of two finite numbers, but it still would have been unclear whether the jury meant to award damages for each claim in the alternative or in the aggregate.

In hindsight, the verdict form could have asked the jury to indicate liability for each claim separately, and then it could have provided one single line for combined damages as to both claims. This would have forced the jury to consider the damages as a whole for one single injury. Neither party proposed this solution.

Finally, at the time of the jury's verdict, the Court asked whether either party wanted to poll the jury, and both parties declined. The Court then excused the jury and instructed them to wait in the jury room. The Court asked the parties whether there were any further issues, and there was a clear opportunity for Rust-Oleum to request any additional clarification from the jury, prior to them being fully excused from their service. In particular, the jury could have been asked whether it intended to award the damages for breach and misappropriation in the alternative or in the aggregate. Rust-Oleum chose not to do so.

The Court addressed all of these arguments in the prior Opinion and Order (ECF #387). Nothing Rust-Oleum presents now offers any new evidence, argument, or case law to alter the Court's analysis or conclusion. There is absolutely no evidence that the jury awarded duplicative damages, and the Court finds that the total award, as aggregated for the two claims, is supported by substantial evidence presented at trial. NIC is not required to elect its recovery.

## II. Rust-Oleum's motion for JMOL based on the release of claims provided in the 2017 Settlement Agreement is denied.

Rust-Oleum asserts that NIC released its claims for misappropriation, fraud, and breach of contract by signing the 2015 Settlement Agreement. The Court disagrees for both procedural and substantive reasons.

### 1. Procedurally, Rule 59(e)'s requirements for reconsideration or amendment of a judgment have not been met.

The Court has already addressed the issues Rust-Oleum raises in this portion of its motion for judgment as a matter of law – namely, whether or not the 2017 Settlement Agreement functioned to release the claims brought by NIC. The Court denied Rust-Oleum's prior motions on this same issue in multiple Opinions and Orders, including on summary judgment (ECF #216), again on reconsideration (ECF #233), and finally in a minute order (ECF #349) ruling on Rust-Oleum's Motion for Directed Verdict (#348).

Reconsideration under Rule 59(e) "should-not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Carroll v. Nakatani*, 342 F.3d 934,945 (9th Cir. 2003) (original citations omitted). It is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Id.* Similarly, under Rule 59(e), a judgment should be amended "to correct manifest errors of law or fact upon which the judgment is based" or to "prevent manifest injustice." *Marsh Aviation Co. v. Hardy Aviation Ins. Inc.*, 720 F. App'x 418, 419 (9th Cir. 2018) (internal quotation marks omitted).

Here, Rust-Oleum fails to present any new evidence, argument, or case law to alter the Court's prior analysis or conclusion. The weight of evidence at trial overwhelmingly supports the jury's verdict against Rust-Oleum. Judgment as a Matter of Law is denied.

## 2. Substantively, the 2017 Settlement Agreement did not release NIC's claims for Misappropriation and Fraud.

Even if the Court were to reconsider its past rulings on this issue, Rust-Oleum is not entitled to Judgment as a Matter of law.

Rust-Oleum asserts that NIC's claims for misappropriation and fraud are barred by that agreement's release of claims between the parties because the conduct that is the basis for these claims occurred, in part, prior to or contemporaneously with, the 2017 Settlement Agreement.

Rust-Oleum points out that, at trial, NIC "argued that Rust-Oleum's misappropriation began long before the parties executed that agreement, showing the jury numerous exhibits about Rust-Oleum's testing of Wipe New… from months before the 2017 Settlement Agreement, in an effort to prove 'reverse engineering.'" Rust-Oleum thus concludes that, "[b]ecause the parties released "any and all claims," NIC's statutory claim for misappropriation is barred by the Settlement Agreement. Rust-Oleum relies on a very similar argument to assert that NIC's fraud claim is barred because the claim is based on "representations made in the Settlement Agreement," which necessarily "existed at the moment [that] release agreement was executed," and were released accordingly.

Rust-Oleum's arguments rely heavily on *Ristau v. Wescold, Inc.*, 318 Or. 383, 868 P.2d 1331 (1994) ("fraud claims arising contemporaneously with the release agreement" need not be explicitly referenced to be barred by "a general release"). In *Ristau*, the Oregon Supreme Court examined a contract's release of claims as well as the carved-out exceptions to the release. *Id.* The Court concluded that the contract's use of the word "obligations," rather than the word "claims," indicated that the parties preserved only "claims that would arise if the parties do not fulfill those obligations in the future." *Id.* at 388. Thus, the Court determined that any prior or contemporaneous claims were released at the moment the agreement was executed.

The case at bar is distinguishable from *Ristau*. As stated by this Court in a prior Opinion and Order in this case, discussing the 2017 Settlement Agreement, "NIC and Rust-Oleum each intentionally carved out specific claims to be excluded from the release. In Section 3 of the Settlement, the parties mutually consented to continuing obligations for Rust-Oleum." (ECF #216 p.10). Section 3, titled "Continuing Obligations," states: "Notwithstanding the termination

of the Agreement, … Rust-Oleum will continue to remain obligated with respect to Sections 6…,

9…, 11…, 12…, and 13… of this Agreement."

The 2017 Settlement Agreement's consistent use of the phrase "Continuing Obligations"

distinguishes it from the bare use of the word "obligations" in *Ristau*. The phrase "Continuing

Obligations" explicitly contemplates a continuity between Rust-Oleum's obligations before and

after the Settlement Agreement. If that were not enough, Rust-Oleum also directly represented

that it had complied with those obligations up to the Settlement and that it would continue to do

so. Thus, unlike *Ristau*, this contract unambiguously preserves any claims arising out of Rust-

Oleum's Continuing Obligations, anywhere along the contractual timeline.[3]

Rust-Oleum also argues that "the obligation to continue performing certain contractual

duties says nothing about preserving non-contractual claims" (emphasis omitted). The Court

disagrees. Based on the plain, unambiguous language of the 2017 Settlement Agreement, Rust-

Oleum agreed to avoid the prohibited conduct. Nothing in the language suggests that NIC

released any claims arising out of the prohibited conduct of the Continuing Obligations, whether

contractual or non-contractual.

As to the prohibited conduct, Rust-Oleum agreed that it had a Continuing Obligation not

to "use, disclose, duplicate (including but not limited to reverse engineering and/or efforts to

---

[3] To the extent that Rust-Oleum argues that the Court acted unfairly by holding that the 2017 Settlement
Agreement released all claims by Rust-Oleum against NIC but did not release all claims by NIC against
Rust-Oleum, that argument has already been addressed by the Court multiple times as well:

> The Court further did not err in finding that the release barred Rust-
> Oleum's claims, but not NIC's. [Rust-Oleum's] request for complete
> mutuality in the enforcement of the Settlement Agreement is belied by
> Paragraph 3 of the Settlement Agreement, stating that Rust-Oleum
> continues to remain obligated with respect to Sections 6… , 9…, 11…,
> 12…, and 13… of the Sales Agreement. ECF No. 1-2. **A parallel provision
> of continuing obligations for NIC does not exist**.

ECF #233 (emphasis added).

reverse engineer the Product) license, sell or reveal any portion of the Confidential Information."
The misappropriation claim arises out of exactly this prohibited conduct. This claim is not
barred by the 2017 Settlement Agreement.

The fraud claim arises out of the contractual representation by Rust-Oleum that it had
complied with the Continuing Obligations and would continue to do so, as well as the extra-
contractual representations that Rust-Oleum made to NIC that it would resume purchases once
its inventory of NIC's product was exhausted.[4]  NIC claims that, in reliance on these
representations, NIC did not reenter the market until 2018.  To the extent that NIC's fraud claim
is based, in part, on a contractual representation, it was explicitly included in the carved-out
exceptions to the release.  However, a substantial portion of the conduct that gave rise to the
fraud did not take place until later, and therefore it could not have been included in the release of
claims. NIC's fraud claim is not barred by the 2017 Settlement Agreement.

### a. The 2017 Settlement Agreement did not release NIC's claim for Breach of Contract.

Rust-Oleum claims that the same provisions bar NIC's claim for breach of contract
because the Settlement Agreement only carves out claims that arise if Rust-Oleum does not
honor its obligations going forward – thus allowing only claims based on conduct post-
Settlement Agreement. This argument fails for the same reason – it is contradicted by the terms
of the 2017 Settlement Agreement. As discussed above, the Agreement titled the carve-out for
Rust-Oleum's prohibited conduct "Continuing Obligations." Rust-Oleum formally represented
that it had complied and would continue to comply with these provisions. The 2017 Settlement
Agreement unambiguously preserved any claims arising out of Rust-Oleum's Continuing
Obligations, anywhere along the contractual timeline.  Any claims arising from the prohibited

---

[4] The details of this extra-contractual representation are discussed extensively below.

conduct were not released, whether contractual or non-contractual. Rust-Oleum is not entitled to

judgment as a matter of law on any claim based on the release of claims in the 2017 Settlement

Agreement.

## III.    Rust-Oleum is not entitled to JMOL or a new trial on NIC's misappropriation claim.

Rust-Oleum moves for JMOL as to misappropriation for two reasons. First, it claims that

NIC failed to prove that it owns a cognizable trade secret. Second, it claims NIC did not prove

that Rust-Oleum's conduct amounted to misappropriation. Under Rule 50(b), judgment as a

matter of law should be granted "if the evidence, construed in the light most favorable to the

nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the

jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). Here, this standard is not met.

The evidence presented at trial supports the verdict as rendered. Rust-Oleum's motion is denied.

### 1.    The jury reasonably found that Rust-Oleum misappropriated NIC's trade secret after being instructed on the law and hearing the evidence.

The jury was instructed on the definition of a trade secret and the definition of

misappropriation under Oregon's version of the Uniform Trade Secrets Act ("OUTSA"). Jury

Instructions (ECF #350) p. 7. The jury was also instructed that, in order to award damages, NIC

must prove 1) that NIC had a trade secret; 2) that Rust-Oleum misappropriated the trade secret;

and 3) that, as a result of the misappropriation, NIC incurred damages. *Id*. The clear weight of

the evidence fell in favor of NIC, and Rust-Oleum has not shown that the jury's reasonable

conclusion and well-rendered verdict should be overturned.

### 2.    The evidence at trial supported the jury's conclusion that NIC had a trade secret.

Under OUTSA, a trade secret is "information, including ... a formula" or "compilation,"

that "[d]erives independent economic value, actual or potential, from not being generally known

to the public or to other persons who can obtain economic value from its disclosure or use." ORS

§ 646.461(4). Rust-Oleum claims that NIC's trade secret was not adequately defined. Rust-

Oleum also claims that, regardless of how it is defined, it fails as a trade secret under OUTSA

because the formulas do not derive independent economic value from their secrecy, and the

active ingredient and the "wipe-on application" were readily ascertainable.

### a. NIC's trade secret was adequately defined by the contract.

NIC's trade secret was adequately defined and consented to by Rust-Oleum in the

contract between the parties. Paragraph 13 of the Sales Agreement states:

> [Rust-Oleum] acknowledges and agrees that NIC is the owner of all
> proprietary rights in NIC products, including but not limited to
> **information regarding the Product and the formulas, design or**
> **manufacture of such products...and that such information**
> **constitutes trade secrets of NIC.** [Rust-Oleum] is not granted any
> right to use, disclose, duplicate (including but not limited to reverse
> engineering and/or efforts to reverse engineer the Product) license,
> sell or reveal any portion of the Confidential Information.

(emphasis added). This paragraph was specifically referenced in the 2017 Settlement Agreement

as one of Rust-Oleum's Continuing Obligations, thus it survived the parties' release of claims.

While a contract provision cannot create a trade secret out of something that does not otherwise

meet the statutory definition, the fact that sophisticated parties in an arms-length negotiation

formally agreed that the information about the formulas was both secret and valuable for being

kept secret, is probative evidence that the "information regarding the Product and the formulas,

design or manufacture of such products," was in fact a trade secret.

Rust-Oleum now claims that it cannot discern what the trade secret is with specificity. Is

it the formulas? The active ingredient? The specific ratios of the active and inactive ingredients?

The wipe on application? The clear and unambiguous answer, based on the Sales Agreement, is

that it is all a trade secret. Rust-Oleum agreed to allow this broad, expansive definition, not just

once, in the Sales Agreement, but again in the Settlement Agreement. Rust-Oleum agreed to

keep all of the information about the Wipe New product secret and confidential, and it agreed not

to try to replicate it or use it in any way, because it agreed that it was NIC's trade secret.

### b. Information about the secret formulas qualifies as a trade secret under OUTSA.

Even without the contractual agreement and definition, NIC proved at trial that the

compilations of the Wipe New formulas were trade secrets under the OUTSA because NIC

developed the formulas, kept the information about the formulas highly confidential, and gained

economic value from keeping them secret. NIC also showed that the formulas and their wipe-on

application were not readily ascertainable.

Testimony from NIC's president Brian Hall confirmed that NIC developed the formulas

for its product, one of which was known as MC156, as well as the precursor AV-945. He

testified that NIC made a strategic decision in 2005 to work with the active ingredient to produce

a high-performance coating for use in niche markets that were not price sensitive. Hall Tr. 408

(ECF #359). Hall testified that no one had commercialized a formula with this ingredient

because it is difficult to work with. *Id.* He testified that the ingredient was: (1) expensive; (2)

hard to get; (3) hard to ship because it expands in the container; (4) had a strong odor; and (5)

reacted with water. *Id.* at Tr. 408-09. He testified that it took NIC years to produce a finished

formula, which began as a spray-on application coating to metal. Later, Tim Wiley discovered

that the formula could also be used in a wipe-on application, but there is no evidence that the

formula was developed by or belonged to anyone but NIC.

Brian Hall also testified that no other company or any individual outside of NIC knew

what was in the Wipe New formulas, and no one else was manufacturing or selling any

similarly-performing product. The jurors heard evidence that NIC employees are required to

sign Confidentiality Agreements that clearly state that: (1) the formulas are owned by NIC; (2) they are confidential; (3) they are trade secrets; and (4) they cannot be disclosed. Tr. 413 (ECF #359). The formulas are stored on a password protected server. *Id.* When the Wipe New product was being developed, new corporate identities were created to shield anyone involved– including employees at both companies – from discerning the relationship between NIC and Wipe New (Avento, Showroom, American Industrial, etc). This protected the ingredients in the formulas from being inferred based on any knowledge of NIC's other lines of products. The laws that require a manufacturer to disclose potential hazardous ingredients also allow an owner of a trade secret to maintain that ingredient as secret while disclosing only the hazard associated with it. NIC utilized this allowance and identified only the solvent ingredients of Wipe New; the active ingredient was identified only as a "resin." This maintained the confidentiality of the formula as a whole. Additionally, while, Tim Wiley discovered that the formula could be used in a wipe-on application, no evidence was offered to show that Tim Wiley ever knew what was in the formula. Under the OUTSA, a trade secret must be the subject of "efforts that are reasonable under the circumstances to maintain its secrecy." NIC has met that burden.

NIC gained tremendous economic value from keeping information about the formulas a secret because it prevented any potential competitors from being able to skip the decade of research and development that NIC had poured into its product and go straight to manufacturing a competing product. NIC provided evidence at trial that its headlight product for Wipe New was the top-performing product in the industry. Hall Tr. 424-25 (ECF #359). The product went from being in 0 stores to being in 100,000 stores in just two years. *Id.* No other company in the industry had a product like Wipe New. *Id.* at Tr. 426. Rust-Oleum paid $40 million to buy the rights to the name "Wipe New" and for the supply contract with NIC. By keeping the trade

secret, NIC could maintain that exclusive supply contract, which it could not do if Rust-Oleum or any competitor learned what was in the formula.

Finally, information about the formulas, including identity of the ingredients individually and as compilations, and the wipe-on application, were not "readily ascertainable," based on the evidence presented at trial. Individuals who had been working in the industry for years, and even individuals who had worked with the specific active ingredient in the formula for decades, did not know what was in NIC's formula. For example, Dr. Alex Lukacs, the inventor of the active ingredient had been working with that ingredient for over 40 years. He testified that he did not know it was an ingredient in NIC's formula until 2015, two years after he began working at NIC. Lukacs Tr. 1099 (ECF #370). Wipe New representative, Tony Bender, testified that he did not know what was in NIC's formula for Wipe New, except for the solvents disclosed in the Safety Data Sheets. (ECF #389; Ex.E; Tony Bender Purged Depo., p.18).

Similarly, it took Rust-Oleum years of research and experimentation and testing to determine the active ingredient in Wipe New.  Evidence submitted at trial showed that Rust-Oleum conducted analytical FTIR testing to break down the ingredients of Wipe New in 2014 and 2015. Rust-Oleum chemists could see that the active ingredient responded the same way in all three FTIR tests, but they had no way to independently identify that ingredient until years later. The active ingredient and the compilation of ingredients in the formula were not readily ascertainable. NIC has therefore proved that the information about its Wipe New formulas qualifies as a trade secret under OUTSA.

### 3.  NIC proved at trial that Rust-Oleum misappropriated NIC's trade secret.

To show misappropriation, NIC must show that Rust-Oleum acquired the trade secret through improper means, or that Rust-Oleum improperly used or disclosed the trade secret. ORS

§ 646.461(2). "Improper means" includes "theft, bribery, misrepresentation, [or] breach... of a duty to maintain secrecy.... Reverse engineering and independent development alone shall not be considered improper means." ORS § 646.461(1).

Here, Rust-Oleum chemist Dr. Haewon Uhm testified that she independently developed a similar product, but the jury chose not to credit this testimony, and for good reason. The overwhelming evidence showed that she consistently tested and used NIC's products to attempt to replicate NIC's specific formula, in violation of the terms of the Sales Agreement and the Settlement Agreement. Certainly, NIC showed that Rust-Oleum reverse-engineered the formula. However, Rust-Oleum cannot hide behind the statutory safe harbor that "reverse engineering alone shall not be considered misappropriation," because it did so in breach of its "Continuing Obligations," which includes the Confidentiality clause. Rust-Oleum's breach of its Continuing Obligations under these agreements clearly satisfies OUTSA's definition of improper means by violating a "duty to maintain secrecy."

Moreover, Rust-Oleum did not just reverse-engineer the formula, it also used that information to develop its own competing product, thus improperly using and disclosing the trade secret in a variety of ways to its own employees, and to competitors and the public. On January 24, 2019, Rust-Oleum publicly disclosed the active ingredient in Wipe New when it published its Safety Data Sheets. Reitman Tr. 1012-13 (ECF #370); Ex. 349, p.3. Prior to this disclosure, NIC had always identified only the solvents in the formula, plus an unidentified "resin." NIC submitted evidence to show that, after Rust-Oleum's disclosure, a company called "Stoner" introduced a competing trim and headlight product in November 2021, which use the same active ingredient as NIC's formulas. Tr. 1016-17 (ECF #370). Stoner advertised the active

ingredient in its competing product, further disclosing the information not just to industry

competitors, but to the public at large. Reitman Tr. 990-991 (ECF #369).

NIC proved that it owns a trade secret, and that Rust-Oleum misappropriated that trade

secret. The jury's verdict is supported by the evidence. Rust-Oleum's motion for JMOL as to this

claim is denied.

### IV.    Rust-Oleum is not entitled to JMOL or a new trial on NIC's fraud claim.

Rust-Oleum moves for JMOL on NIC's fraud claim, asserting that 1) it improperly

sounds in contract and not in tort, and 2) it is preempted by OUTSA. This motion is denied.

#### 1.  NIC's fraud claim does not improperly sound in contract rather than in tort.

Rust-Oleum claims that NIC's fraud claim rests entirely on Rust-Oleum's alleged breach

of "representations made in the Settlement Agreement" (citing Court opinions ECF #387 at p. 4

and ECF #348).

The Oregon Supreme Court has held:

> To obtain relief in tort for fraud associated with a contract, a duty
> 'must *exist independent of the contract and without reference to the*
> *specific terms of the contract....* [T]hat duty in tort does not arise
> from the terms of contract, but from the nature of the parties'
> relationship.'

*Conway v. Pacific University*, 324 Or. 231, 237–38, 924 P.2d 818 (1996), citing *Georgetown*

*Realty v. The Home Ins. Co.*, 313 Or. 97, 106, 831 P.2d 7 (1992) (emphasis in original).

However, in *Conway*, the claim at issue was negligent misrepresentation, not intentional fraud.

The Oregon Court of Appeals has subsequently held that this rule "applies only to negligence

claims, not to intentional torts like fraud." *McNeff v. Emmert*, 260 Or. App. 239, 249, 317 P.3d

363, 368 (2013).  The *McNeff* court explained that this is because the difficulty for the court in

reconciling tort and contract remedies "concerns the source—contract or otherwise—that

provides the applicable standard of care." *Id.* at 250. Typically, if the contracting parties are in a special relationship, then the relationship serves as the source. *Abraham v. T. Henry Construction, Inc.*, 350 Or. 29, 39–40, 249 P.3d 534 (2011). "However, although the source of the standard of care is a crucial consideration for negligence claims, it is not an issue for intentional tort claims, including fraud." *McNeff*, 260 Or. App. at 250, 317 P.3d 363. Even the *Conway* court, prior to *McNeff*, acknowledged that "[i]n some situations, a party may be able to rely on either a contract theory or a tort theory or both." *Conway*, 324 Or. at 238 (citing *Georgetown Realty, Inc. v. Home Ins. Co.*, 313 Or. 97, 106, 831 P.2d 7, 12 (1992)); *see also Ashmun v. Nichols*, 92 Or. 223, 234–35, 180 P. 510 (suggesting that a plaintiff might be able to rely on both contract and tort theories).

However, a party may not affirm and rescind a contract at the same time. A fraud claim is only inconsistent with a claim for breach of contract if the fraud claim is an action to rescind the contract rather than to affirm the contract and sue for damages. *Julian-Ocampo v. Air Ambulance Network, Inc.*, Civ. No. 00-1262-KI, 2001 WL 34039480, at *4 (D. Or. Dec. 13, 2001) (citing *Eulrich v. Snap-On Tools Corp.*, 121 Or. App. 25, 41, 853 P.2d 1350, 1361 (1993), *cert. granted, judgment vacated on other grounds*, 512 U.S. 1231, 114 S. Ct. 2731, 129 L. Ed. 2d 854 (1994). If there is an inconsistency between remedies, plaintiff must make an election of remedies after the case has gone to judgment on the merits. *Id.*

Here, the Court agrees that the fraud claim is partially based on representations made in the 2017 Settlement Agreement, in which Rust-Oleum formally represented that it had complied and would continue to comply with the Continuing Obligations not to reverse-engineer the formulas. It was also based on the testimony of NIC president Brian Hall. He told the jury that his contact at Rust-Oleum, Lisa Stach, represented to him that Rust-Oleum would purchase more

Wipe New formula from NIC once it had worked through its backlog of inventory of the product.

Hall Tr. 496-97 (ECF #360). Hall testified that he relied on this representation by Lisa Stach

because of the representations made in the Settlement Agreement that Rust-Oleum had not

reverse engineered the product. *Id* at Tr. 498. NIC argued at trial that his reliance was reasonable

because Hall testified that Rust-Oleum continued to provide NIC with sales forecasts after 2017.

*Id.* at 498 ("I'd get e-mails on a regular basis that said, "Hey, here's how much inventory we

have, and we're burning through it.").

     Mr. Hall then testified that NIC chose not to enter the market with a competing product in

reliance on all of these representations and due to the on-going relationship between NIC and

Rust-Oleum. Hall Tr. 497 (ECF #360). NIC did not want to jeopardize that relationship by

producing a competing product, if Rust-Oleum just needed more time to sell the goods. *Id.*

Further evidence of NIC's reliance is shown by the testimony of Lisa Stach herself, who said that

Mr. Hall started calling and emailing Rust-Oleum in 2018 because he was expecting Rust-Oleum

to purchase more product. Tr. 1051-54 (ECF #370).

     The jury was instructed as to the elements of fraud as follows:

> To prevail on a claim of fraud, NIC must prove all of the following:
> 1. Rust-Oleum made a false representation of a material matter;
> 2. Rust-Oleum knew that the representation was false or recklessly made the representation without knowing if it was true or false;
> 3. Rust-Oleum intended to mislead NIC, knew that it was misleading NIC, or recklessly disregarded whether it was misleading NIC;
> 4. NIC reasonably relied on the representation; and
> 5. NIC was damaged as a direct result of its reliance on the representation.

Jury Instructions (ECF #350) p. 8-9. The jury found Rust-Oleum liable for fraud, and, based on

the facts discussed above, the evidence supports the jury's verdict. There is no assertion by either

party that NIC is attempting to rescind the contract, and the damages arising out of NIC's

reliance on Rust-Oleum's misrepresentations do not overlap with the damages for breach of

contract or misappropriation.   Rust-Oleum's motion for JMOL as to fraud, due to the claim

sounding in contract, is denied.

### 2.  NIC's fraud claim is not preempted by OUTSA.

OUTSA supersedes "conflicting tort, restitution or other laws of Oregon providing civil

remedies for misappropriation of a trade secret." ORS 646.473(1). Actions seeking contractual

and criminal remedies are not affected by OUTSA. ORS 646.473(2)(a) and (c). A plaintiff may

still pursue an action for "civil remedies that are not based upon misappropriation of a trade

secret." O.R.S. 646.473(b). However, where the essence of the claim relates primarily to the

alleged misappropriation of a trade secret, the claim is displaced by the preemptive language of

OUTSA. *Acrymed, Inc. v. Convatec,* 317 F. Supp. 2d 1204, 1217 (D. Or. 2004) (citing *Hutchison

v. KFC Corp.*, 809 F.Supp. 68, 72 (D. Nev.1992)).

In *Opal Labs*, the court found that the plaintiff's claim for Tortious Interference with

Economic Relations was superseded by OUTSA, but a claim for fraud was not. *Opal Labs, Inc.,

v. Sprinkler, Inc.*, No. 3:18-CV-01192-HZ, 2021 WL 3713042 (D. Or. Aug. 19, 2021). The

distinction turned on whether the operative facts of the claim were the same as the operative facts

for misappropriation. *Id*. at *7.   In *Opal Labs*, the Tortious Interference claim was based on

allegations that the defendant developed a knockoff version of the plaintiff's software using

improper means, and attempted to sell that product to the plaintiff's clients and prospective

clients. *Id*.  The court found these facts were substantially the same as the operative facts

comprising the claim for misappropriation, and thus it was preempted by OUTSA. By contrast,

the court determined that the allegations at the core of plaintiff's fraud claim did not depend on

the claim for trade secret misappropriation. The court summarized the fraud allegations:

> [Plaintiff alleges that] Defendant made false representations to
> Plaintiff regarding its access to Plaintiff's software, the parties'

> business relationship, and Defendant's plans to develop its own marketing collaboration product. Plaintiff alleges that these misrepresentations were made with the intent to "induce [Plaintiff] to continue in a business relationship with [Defendant], to provide [Defendant] with further access to [Plaintiff's] software, and to trick [Plaintiff] into believing that it did not face a competitive threat to its relationship with Nike from [Defendant]." Plaintiff asserts that it relied on these statements in continuing its relationship with Defendant, delaying the filing of a lawsuit, giving Defendant access to its software to jointly pitch clients, agreeing to integrate with Defendant, and allowing Defendant and others access to its software.

*Id.* (citations to the case record omitted). The court noted that there was "some overlap" in the allegations underlying the trade secret claim and the fraud claim, but it determined that "the core allegations" of the fraud claim "are not the operative facts underling the trade secret misappropriation." *Id.* "As the essence of Plaintiff's claim for fraud does not relate primarily to the alleged misappropriation," the fraud claim was not preempted by OUTSA.

Here, NIC's fraud claim is not preempted by OUTSA. As in *Opal Labs*, the allegations of the fraud claim have some overlap with the misappropriation claim. Rust-Oleum's contractual obligation not to reverse-engineer is present in both claims. But, as discussed in the section above, the core allegations of the fraud claim depend on NIC's reliance on Rust-Oleum's representations that it had not reverse engineered the product, as well as the representation that it would order more Wipe New product from NIC eventually, when it used up its inventory.

Rust-Oleum claims that this theory of fraud was never presented to the jury. This is incorrect. Brian Hall gave the following testimony on Day 3 of the trial:

> Q. Now, was it your understanding at this time that, if you wanted to, you could go out and sell the product to whoever you wanted?
> A. I could, yes.
> Q. And did you do that?
> A. No.
> Q. And why not?

> A. Because I had numerous conversations with Lisa Stach. And she's a senior vice president of purchasing. And the way she laid it out to me is, "Look, Brian, we can't meet our minimum purchase requirements, but we're just going to buy what the market requires." And I thought, you know, that's a really fair statement.
>
> …
>
> … So Lisa said, "Brian, we're just going to buy what we need and you're released, but that -- that conversation and knowing that we're going to buy it from you, you know, but you can go do other things if you want. But we're still your best option if you want to get your product to -- to the world."
> Q. So did you refrain from going out on the market?
> A. I did, based on the claim that they weren't going to reverse engineer our product and they were going to buy what the market would allow. It would -- it would've been foolish of me to go out and compete with them.

Hall Tr. 496, 497 (ECF #360). He also testified that Rust-Oleum continued to provide NIC with sales forecasts after 2017. *Id*. at 498 ("I'd get e-mails on a regular basis that said, "Hey, here's how much inventory we have, and we're burning through it."). Hall testified that these actions made him believe that Rust-Oleum would eventually buy more product from NIC.

Based on this testimony, the Court finds that the essence of NIC's claim for fraud does not depend primarily on the facts underlying the claim for trade secret misappropriation. Rust-Oleum's motion for JMOL on this claim is denied.

## V.    Rust-Oleum's motion for JMOL on damages is denied.

Rust-Oleum challenges NIC's expert witness on damages, Dr. Williams, and claims that his calculations relied on speculative assumptions not based on any facts or data. Rust-Oleum also moves for a new trial, claiming that the Court allowed evidence of improper measures of damages and improperly instructed the jury.

Both parties filed motions in limine seeking to challenge each other's experts, on the eve of trial. The Court denied these motions. Tr. 1556-1557 (ECF #372). Rust-Oleum claims the

Court failed to walk through the full *Daubert* analysis, but the Court put the following findings on the record:

> I've now heard the experts at issue and... generally I found the experts to be well-qualified. I found they all had solid analytic approaches they had taken to their analyses. They weren't novel. I didn't get any sense that any of these approaches were novel or way out in left field. I think they all had data methods they relied upon, they explained what they were, and provided projections. ... I thoughts the experts disagreed, but they're extremely well-qualified. It doesn't strike me as the kind of evidence, frankly, that *Daubert* or 702 is frankly geared toward.

*Id.* In this motion, Rust-Oleum presents no new evidence or law that would change the Court's analysis upon reconsideration. Nevertheless, in the absence of a prior written opinion on this issue, the Court will address Rust-Oleum's challenge in full.

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Under the Supreme Court's ruling in *Daubert*, federal judges ruling on the admissibility of expert scientific testimony must engage in a two-part analysis. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993). First, the court must determine whether the experts' testimony reflects "scientific knowledge," whether their findings are "derived by the scientific method," and whether their work product amounts to "good science." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)

Second, the court must ensure that the proposed expert testimony is "relevant to the task at

hand," *i.e.*, whether it is a logically good "fit" for the proponent's case. *Id.* "Federal judges must

therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are

convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not

mislead the jury." *Id.* at 1321.

The court's gatekeeper function under *Daubert* does not, however, replace the role of the

factfinder. *Bakst v. Cmty. Mem'l Health Sys.*, Inc., 2011 WL 13214315, at *18 (C.D. Cal. Mar. 7,

2011). Indeed, the district court may not "evaluate the credibility of opposing experts and the

persuasiveness of competing scientific studies[.]" *Quiet Technology DC–8, Inc. v. Hurel–Dubois*

*UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129,

141 (D.C. Cir. 1996)). The jury is entitled to hear expert testimony and decide whether to accept

or reject it after considering whether the predicate facts on which the expert relied were accurate.

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (11th Cir. 2002)

### 1. Dr. Williams' expert's testimony was sufficiently tied to the facts of the case to meet the *Daubert* fit requirement.

Rust-Oleum first challenges the opinion of Dr. Williams by claiming that his damages

calculations were not based on any facts or data. This is, essentially, a challenge to the "fit" of

the expert opinion to the facts of the case.

In *Bakst*, the proffered expert's damages calculation was based on an assumption that the

plaintiff would obtain employment as a hospital CEO. *Id.* However, the plaintiff failed to offer

evidence that he applied for and was rejected for a hospital CEO position after 2007. "Because

the court limited [the plaintiff's] damages to those flowing from positions for which he applied

during and after 2007, and [the plaintiff] failed to proffer evidence that he applied for CEO

positions during and after 2007," the court found that the expert's testimony was insufficiently

tied to the facts of the case to meet the *Daubert* fit requirement. *Bakst v. Cmty. Mem'l Health Sys.*, Inc., 2011 WL 13214315, at *189 (C.D. Cal. Mar. 7, 2011).

Here, NIC's expert Dr. Williams offered more than one theory of damages. For all of them except the unjust enrichment calculation, he assumed that NIC's trade secret had a 30-year shelf life and a dominant market share of 15%, 20%, or 25%. Ex. 360A, slide 28/51. This assumption was based on comparisons to other companies with excellent products, market dominance, and long shelf-lives, such as Armor All (shelf-life over 50 years) and WD-40 (shelf-life over 70 years). Williams Tr. 1187 (ECF #370). As discussed thoroughly above, NIC offered plenty of evidence through the testimony of Brian Hall of the excellent quality, as well as the market transformation and dominance of Wipe New. No other company was making a product like Wipe New. Tony Bender also testified that Wipe New performed better than any other product on the market. (ECF #389; Ex. E; Bender Purged Depo., p.29). Wipe New was the number one car trim and headlight product in the country. *Id.* at 55. Rust-Oleum did not dispute this evidence. The Court finds that, unlike the expert's opinion in *Bakst*, Dr. Williams' projection was sufficiently tied to the facts in evidence.

Tellingly, Rust-Oleum's rebuttal expert witness on damages, Kimberly Train, used the exact same methodology and data as Dr. Williams, except that she assumed a shelf life of only five years and a market share of only 9.8%. Tr.1330-31, 1341-42 (ECF 371). Ms. Train explained her reasoning, which was based on the term of the contract between the parties. Rust-Oleum also questioned her about Dr. Williams' approach, and she explained why it was incorrect from Rust-Oleum's perspective as well as her own. Thus, each party was allowed to present competing expert opinion evidence, and both opinions were sufficiently grounded in the facts in evidence to allow the jury to consider which opinion was supported by the facts that it found

most credible. Under FRE 702 and *Daubert*, the jury was entitled to decide which opinion to accept and which to reject in light of all of the evidence presented.

### 2. Evidence regarding the fair market value of NIC's trade secret and NIC's lost profits was properly allowed.

Rust-Oleum also claims that the jury was allowed to consider an invalid measure of damages when it heard evidence of the fair market value ("FMV") of NIC's trade secret. Rust-Oleum cites the following: "Where the plaintiff retains the use of the secret... and where there has been no effective disclosure of the secret through publication, the total value of the secret to the plaintiff is an inappropriate measure [of damages for misappropriation]." *Ajaxo Inc. v. E\*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1306, 115 Cal. Rptr. 3d 168, 178 (2010) (internal citation omitted). It is questionable whether the *Ajaxo* case is sufficiently analogous to the case at bar. In *Ajaxo*, the plaintiff attempted to prove unjust enrichment damages, but the defendant convinced the jury that it actually lost money on the misappropriated trade secret. That did not happen in this case.

Nevertheless, even if we accept the rule as stated by *Ajaxo*, NIC presented evidence at trial that Rust-Oleum published a Safety Data Sheet on January 24, 2019, revealing the active ingredient in NIC's formulas, thus causing a public disclosure through publication. Reitman Tr. 1012-13 (ECF #370); Ex. 349, p.3. Prior to this disclosure, NIC had always identified only the solvents in the formula, plus an unidentified "resin." Rust-Oleum made further disclosures of NIC's formula for Wipe New in Safety Data Sheets in October of 2019 and on October 7, 2020. Tr. 1013-15 (ECF #370); Exs. 355, 368.

NIC also submitted evidence to show that, after Rust-Oleum's disclosure through publication, a company called "Stoner" introduced a competing trim and headlight product in November 2021, which used the same active ingredient as NIC's formulas. Tr. 1016-17 (ECF

#370). Stoner advertised the active ingredient in its competing product, further disclosing the information not just to industry competitors, but to the public at large. Reitman Tr. 990-991 (ECF #369). The jury was entitled to credit this testimony and decide that FMV was the proper measure of NIC's actual loss. Whether or not Rust-Oleum should have been entitled to a discount against the FMV to account for NIC's mitigation is addressed below.

Rust-Oleum also claims that NIC did not offer any evidence of lost profits, but instead sought disgorgement of Rust-Oleum's profits, which is not allowed. Rust-Oleum mischaracterizes the evidence. In his testimony about NIC's lost profits, Dr. Williams stated that he considered the lost net profit that NIC would have made "off the sales of Rust-Oleum's Wipe New product." Williams Tr. 1211 (ECF #370). Dr. Williams considered, based on the discovery produced by Rust-Oleum, how much product was sold by Rust-Oleum, and how much formula was in that product. *Id.* He assigned a value of $200 / gallon to the formula because that was the value of what NIC would have sold Rust-Oleum if it had been supplying the formula for those sales, and then he multiplied that by his estimation of the total number of gallons Rust-Oleum sold. *Id.* This is not disgorgement of Rust-Oleum's profits; it is a calculation of what NIC would have been able to make in profit if it had supplied the formula to Rust-Oleum for those sales, absent the misappropriation and breach.

### 3. Any error in failing to instruct on mitigation was harmless.

Rust-Oleum claims that the Court erred by failing to instruct the jury as to mitigation. Rust-Oleum proposed the following instructions at trial:

> A party damaged by a breach of contract is required to make reasonable efforts to minimize its loss.
> A party who fails to do so cannot recover for that portion of the loss it reasonably could have avoided.
> A party which successfully minimizes its losses cannot recover for that portion of the loss it successfully avoided.

Rust-Oleum Prop. Jury Instruct. p. 15 (ECF #343).

A plaintiff cannot recover damages for losses that could have been avoided by reasonable

conduct on the plaintiff's part. *State v. Rock*, 280 Or. App. 432, 437, 380 P.3d 1084, 1087 (2016)

(citing *Blair v. United Finance Co.*, 235 Or. 89, 91, 383 P.2d 72 (1963)). "The burden of proving

a failure to mitigate damages falls on the person causing the damage." *State v. Jurado*, 137 Or.

App. 538, 541, 905 P.2d 274 (1995); *see also McCulloch v. Price Waterhouse LLP*, 157 Or. App.

237, 246 n 5, 971 P.2d 414 (1998), *rev. den.*, 328 Or. 365, 987 P.2d 510 (1999) ("The general

rule is that a wrongdoer has the burden of proof to show that the plaintiff failed to take

reasonable measures to mitigate damages or avoid consequences."). However, mitigation does

not apply to a lost-volume seller. *Trienco, Inc. v. Applied Theory, Inc.*, 102 Or. App. 362, 366,

794 P.2d 1239, 1242 (1990) (discussing cases).

The Court did not give any instructions on mitigation for three reasons. First, as Rust-

Oleum admits, if NIC was required to mitigate, it did so by launching new Cerekote products.

This fact was undisputed. Therefore, whether or not mitigation took place was not an issue the

jury needed to consider. Second, Rust-Oleum did not present any evidence to the jury regarding

the amount of damages that NIC avoided through mitigation. This appeared to be a tactical

choice made by Rust-Oleum to avoid tacitly agreeing with the amount of damages proposed by

NIC's expert. Regardless of the reason that it chose not to offer this evidence, however, the fact

remains that it did not. Lacking any evidentiary basis on which to make a mitigation calculation,

the Court could not reasonably ask the jury to do so.

Third, NIC asserted and provided evidence that it was a lost-volume seller. NIC

president Brian Hall testified on Day 7 of the trial. After discussing NIC's product, Cerakote

Trim, Mr. Hall was asked, "Does your company have the manufacturing capacity to have

provided the bulk Wipe New formulas to Rust-Oleum for that time period we've projected out

into the future?" He answered, "Yes we did." Hall Tr. 1286 (ECF #371). Rust-Oleum offered no

cross-examination or rebuttal evidence on this point. For all of these reasons, any error in failing

to instruct the jury as to mitigation was harmless.

## VI.    The Court will not reduce the punitive damages awarded in this case.

The Court follows these guideposts when evaluating an award of punitive damages: (1)

the degree of reprehensibility, (2) the disparity between the harm suffered and the punitive

damages award, and (3) the difference between this remedy and the civil penalties authorized or

imposed in comparable cases. *Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*, 405 F.3d

764, 775 (9th Cir. 2005) (citing *BMW of North America Inc. v. Gore*, 532 U.S. 559, 116 S Ct.

1589, 134 L.Ed.2d 809 (1996).

### 1.    Rust-Oleum's conduct was sufficiently reprehensible.

When evaluating the reprehensibility of a party's conduct, the Court looks to whether

"the harm caused was physical as opposed to economic; the tortious conduct evinced an

indifference to or a reckless disregard of the health or safety of others; the target of the conduct

had financial vulnerability; the conduct involved repeated actions or was an isolated incident;

and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State

Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155

L.Ed.2d 585 (2003).

In *Bains, LLC*, the Ninth Circuit noted that the harm was economic and there was no

threat of physical harm, which reduced reprehensibility. 405 F.3d at 775. However, "the conduct

was not an isolated incident but repeated, the target was highly vulnerable financially, and the

harm resulted from intentional malicious conduct." *Id.* The court also noted that there was no

socially valuable reason or task underlying the bad conduct, and the defendant made no effort to ameliorate the harm or address the harmful conduct. *Id.* Therefore, the court found that the jury could have properly concluded that punitive damages were necessary to prevent such harmful conduct in the future.

Here, the harm was economic, and there was no threat of physical harm, thus reducing reprehensibility. However, evidence was offered to show that the conduct was not an isolated incident, but that it had happened before. Neal Barry testified that Rust-Oleum had not reverse-engineered any products in his 39 years with Rust-Oleum. Barry Tr. 570 (ECF #360). However, on cross-examination, Barry admitted that another lawsuit had been filed against Rust-Oleum, by a company called "Plasti-Dip," for reverse-engineering and stealing Plasti-Dip's formula. *Id.* at 574. The jury did not hear any further information about that case – it did not hear any specific facts that could have been inflammatory or otherwise prejudicial. Therefore, there is no evidence that the jury intended to punish Rust-Oleum for its conduct in that other case. However, the fact that this may be part of a pattern and practice of Rust-Oleum's business is a factor the court must consider regarding reprehensibility.

Evidence was also offered to show that Rust-Oleum employees and chemists all knew that NIC's formula was proprietary, and that they formed an intentional plan to misappropriate NIC's trade secret, (Stack Tr. 1073; ECF #370), increase Rust-Oleum's profits by 25%, (Ex. 308; Ferguson Tr. 836-37; ECF #361), and cause harm to NIC's business. They called it "Project Torpedo." Ferguson Tr. 846 (ECF #361); Uhm Tr. 640 (ECF #360). This is compelling evidence of intentional malice, trickery, or deceit – certainly it does not support a finding that Rust-Oleum's conduct was a "mere accident." Finally, when NIC sent Rust-Oleum a cease-and-desist

letter, Rust-Oleum did not ameliorate or investigate the harm, but instead filed a lawsuit against NIC.

As in *Bains, LLC*, here there is evidence that this was not an isolated incident, that the conduct was intentional and malicious, and that Rust-Oleum made no effort to ameliorate the harm. Unlike in *Bains, LLC*, here, NIC was not "highly financially vulnerable," but Rust-Oleum was in the position of being a much larger company, with more resources, more name-recognition, and a more established customer base and higher distribution network. Hall Tr. 1287 (ECF #371). To the extent that either party was more financially vulnerable, it was NIC.

Rust-Oleum claims that its conduct was not malicious because its VOC testing of NIC's product "began as an effort to comply with California environmental laws." Rust-Oleum Reply p. 29 (ECF #438) (citing Barry Tr. 550:1–554:21 (ECF #360)). Rust-Oleum claims this fact was undisputed in the record, but this is incorrect. NIC offered evidence that such testing was not necessary because NIC was developing its own California-compliant formula. Additionally, while the VOC testing took place, according to Rust-Oleum, prior to the parties' Sales Agreement that prohibited Rust-Oleum from doing any testing, it is undisputed that the VOC testing did not reveal the formula or the ingredients that were subject to the trade secret – that was the later FTIR testing, which Rust-Oleum chemists performed as part of Project Torpedo. Uhm Tr. 640, 654 (ECF #360). While the jury certainly could have believed Rust-Oleum's version of the facts presented, it is clear that it did not. For all of these reasons, the jury could have properly concluded that punitive damages were necessary to prevent such harmful conduct and malicious business practices in the future.

**2. Considering the disparity between the harm suffered and the punitive damages award, and the difference between this remedy and the civil penalties authorized, neither weigh in favor of reducing the punitive damage award.**

In this case, the final two factors overlap and consider the same facts, so the Court will address them together. First, OUTSA explicitly allows for punitive damages in the amount of two-times the compensatory damages, which is what was awarded here for misappropriation of a trade secret. ORS 646.465(3). The Court finds this is a reasonable amount to punish and deter willful and malicious misappropriation. Second, the jury used the same ratio to award two-times the amount of compensatory damages as to the fraud claim as well. The Court finds this is reasonable to punish unethical business practices.

Rust-Oleum claims that, despite being explicitly authorized by Oregon statute, the punitive damages awarded here violate due process because they exceed a 1-1 ratio with the compensatory damages. The Supreme Court has been clear in rejecting a bright-line ratio that a punitive damages award cannot exceed. *State Farm Mut. Auto. Ins. Co.,* 538 U.S. at 425, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003). To the extent that the Court has offered guidance on specific ratios, it has held that, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1… or … 145 to 1." *Id.* The Court also suggested that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* However, the Court then reiterated that "the precise award in any case must be based upon the facts and circumstances" of the wrongful conduct and the resulting harm. *Id.*

As discussed above, the evidence at trial supports the jury's decision to award NIC punitive damages equal to two-times the compensatory damages awarded. Rust-Oleum's conduct was sufficiently reprehensible, and the punishment is reasonable and proportionate to the harm. The punitive damages awarded do not violate due process.

**VII.** **Rust-Oleum is not entitled to a new trial based on prejudicial admission of evidence.**

Rust-Oleum claims that it is entitled to a new trial based on the prejudicial admission of three categories of evidence: the Expert Reports, the Supplemental Report, and the "unadmitted" exhibits. The admissions of evidence were not in error. However, regardless of any error as to the evidence admitted, Rust-Oleum is not entitled to a new trial.

**1. The Expert Reports were properly admitted under Rules 703 and 106, or their admission was harmless error.**

At trial, Rust-Oleum made the following evidentiary objection regarding admission of NIC's expert's written report:

> Your Honor, I object to the introduction of the report itself. It is hearsay. It is also self-serving hearsay. In addition to that, it contains improper measurements of economic damages in the case. In addition to that, it's got legal factors in there that may or may not end up in this Court's charge, including oral briefs. I don't have a problem with certain charts being admitted, and obviously the jury has seen this, but as to the entire report, I have those objections. And also, of course, the objections contained in the *Daubert* motion under 702.

Essentially, counsel was renewing his objection to the substance of the expert opinion, which is discussed above in the context of Rule 702 and Daubert. He also made a hearsay objection to the admission of the written report itself, and he objected to any potential statement of legal standards contained therein. Opposing counsel agreed on the record to redact any legal standards. Therefore, the only remaining unaddressed objection to the admission of the written expert reports is a hearsay objection. For the reasons below, the written reports were admissible under Rules 703 and 106.

Under the Federal Rules of Evidence, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

matter asserted." Fed. R. Evid. 801(c). Some courts have found that the written reports of an

expert are inadmissible hearsay, *see Hunt v. City of Portland*, 599 F. App'x 620, 621 (9th Cir.

2013), but they have also found that expert reports are admissible to prove the basis of the expert

opinion under Rule 703, *see Paddack v. Dave Christiansen, Inc.,* 745 F.2d 1254 (9th Cir. 1984).

Rule 703 states:

> An expert may base an opinion on facts or data in the case that the
> expert has been made aware of or personally observed. If experts in
> the particular field would reasonably rely on those kinds of facts or
> data in forming an opinion on the subject, they need not be
> admissible for the opinion to be admitted. But if the facts or data
> would otherwise be inadmissible, the proponent of the opinion may
> disclose them to the jury only if their probative value in helping the
> jury evaluate the opinion substantially outweighs their prejudicial
> effect.

However, while Rule 703 "permits such hearsay, or other inadmissible evidence, upon which an

expert properly relies, to be admitted to explain the basis of the expert's opinion," it does not

allow the admission of the reports to establish the truth of what is asserted. *Paddack*, 745 F.2d at

1261–62 (citing *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1356 (5th Cir.1983).

Here, the written expert reports were admissible to prove the basis for the expert opinions

under Rule 703. This is easily demonstrated by the reports themselves, which formulated

different theories of damages and different calculations based on different sets of hypothetical

data. For instance, Dr. Williams' report included a variety of different valuations of the FMV of

NIC's formulas, based on differing assumptions about shelf-life and dominant market share.

This was not submitted to show the truth of that underlying information – the report did not

prove that Wipe New affirmatively had or will have a 30-year shelf life and a 25% market share.

The report merely stated what the damages would be if that assumption were true. Then it stated

what the damages would be if other assumptions were true – a 30% market share, for instance,

would result in a different valuation. Thus, the expert reports of both parties were admissible to show the jury exactly what data was being used for each valuation so that the jury could decide which valuation to use to calculate damages in the context of all of the other evidence they heard during the trial.

NIC argues that expert reports are not hearsay when an expert testifies and adopts their report as their testimony. *See BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil*, 184 F.R.D. 3 (D.D.C. 1999). This theory comports with the advisory committee's notes to the federal rules: "When a witness, on the stand and under oath, acknowledges that a prior statement is his own statement and is truthful, then the witness adopts the prior statement as his present testimony and there is no hearsay problem." Fed. R. Evid. 801 advisory committee's note (d)(1). However, still other courts have held that the admission of a prior consistent statement is error unless it is offered to rebut a charge of fabrication or improper motive. *United States v. Check*, 582 F.2d 668, 680 (2d Cir. 1978). The Court is not convinced by NIC's argument, especially without the prerequisite charge of fabrication or improper motive being satisfied.

However, NIC also argues that, during trial, Rust-Oleum attempted to misconstrue the testimony of NIC's expert witnesses, summarizing the expert testimony in questions on cross-examination and attempting to mischaracterize the testimony given. *See* Williams Tr.1256-61 (ECF #371). Federal Rule of Evidence 106 states:

> If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection.

Here, NIC contends that it was necessary to admit the written reports themselves as evidence of the testimony to provide the jury with a complete and accurate record of the statements made by the experts. The Court agrees.

Page 39 – Opinion and Order

Additionally, the traditional risks of admitting hearsay – namely, unreliability and the inability of the opposing party to cross-examine the declarant – were not present in this instance. The reports were based on solid methodology, data that came from discovered materials, and the statements merely represented each expert's testimony in a written form. Each party had the opportunity to take the experts' depositions prior to trial, and to cross examine them during trial. The fact that there were many different numbers, complex theories, and mathematics involved made it more important for the jury to be able to see those calculations written out and to read what they were based upon. The written reports were important keep the numbers straight despite potential confusion based on the questions asked to the witnesses during direct or cross examination. For all of these reasons, the Court found that the written reports would be admitted because they were helpful to the jury, and not prejudicial to either side.

Finally, any error in admitting the written reports was harmless. The Court admitted the expert reports of both parties, allowing the jury to have both side's numbers in front of them when considering their verdict. Rust-Oleum is not entitled to a new trial.

### 2. The Supplemental Exhibit was properly admitted, or it was harmless error.

Dr. Williams' supplemental exhibit was admitted as Exhibit 369. NIC laid the foundation for this exhibit with Dr. Williams during his testimony on Day 8 of the trial. Williams Tr. 1402 (ECF #372). Rust-Oleum objected to admission of this exhibit, and asked Dr. Williams questions in aid of the objection. Rust-Oleum objected because the exhibit had not been produced prior to trial, and Dr. Williams conceded that it was something he had been working on for the last few days, while the trial was on-going. However, NIC showed that the data contained in the exhibit was sales information that was already contained in Exhibit 358A p. 71, and Exhibit 260A slide 41,51, and the same information was contained in Rust-Oleum's

damages expert report by Ms. Train, Exhibit 632 slide 30-31, 51. Dr. Williams took that data and projected out the Cerekote sales for the remaining "life of the product" to come up with a potential mitigation number.

Rust-Oleum claims that the data provided in the supplemental exhibit contained some data that was provided in discovery, but also contained some newer, more recent data about NIC's sales from April 18, 2024, to August 31, 2024, which had not been disclosed to Rust-Oleum until the last day of trial. Despite filing a declaration filled with extra facts and argument on this issue, Rust-Oleum claims only that "the prejudice to Rust-Oleum is self-evident." No actual prejudice is discussed or even mentioned. The Court fails to see how this evidence harmed Rust-Oleum's case in any way. In fact, it could have been used by Rust-Oleum to argue for a lower award of damages, based on mitigation. Rust-Oleum chose not to use that information in its closing argument. Therefore, as above, even if admission of the supplemental report by Dr. Williams, Exhibit 369, was an error, it was harmless.

### 3. Admission of the "unadmitted" exhibits was proper, or it was harmless error.

On September 27, 2024, after the jury rendered a verdict in this case, the Courtroom Deputy returned the binders full of the parties' exhibits, with which the jury had deliberated, back to the attorneys, and the Court ordered that "the parties retain custody of their respective exhibits until such time as all need for the exhibits has terminated." (ECF #354). Many months later, on February 17, 2025, Rust-Oleum attorney Nicholas Boniminio claims that he "noticed for the first time that the exhibit binders returned to Rust-Oleum contained numerous exhibits that had not been admitted." Boniminio Decl. (ECF #414). In early March, the parties exchanged copies of the trial exhibits that each had received back from the Court. Boniminio claims that he reviewed the exhibits given to him by NIC, and he asserts that:

Page 41 – Opinion and Order

> Based upon that review, the jury exhibit binders returned to NIC also contained numerous trial exhibits that were not admitted by the Court but appear to have been provided to the jury. …[I]t is my belief that the following forty-one (41) NIC trial exhibits contained in the jury exhibit binders returned to NIC by the Court were unadmitted but appear to have been provided to the jury: 202, 216, 217, 219, 230, 233, 235, 236, 238, 238B, 241, 244, 267, 283, 284, 290, 292, 293, 301, 302, 303, 318, 319, 320, 321, 323, 324, 335, 336, 337, 339, 342, 345, 346, 348, 357, 357A, 357B, 357C, 359, and 364.

Boniminio Decl. at p. 3-4. He similarly asserts that seventy-six (76) Rust-Oleum trial exhibits contained in the jury exhibit binders returned to Rust-Oleum by the Court were unadmitted but appear to have been provided to the jury. *Id.* at p. 4.

The Boniminio declaration lays out many of the contextual facts regarding the parties' submission of exhibits, the admission of exhibits into evidence, and the return of the exhibits to the parties after trial. However, the declaration omits one crucial fact. Both parties' attorneys were in the Courtroom with the Courtroom Deputy and the Judicial Law Clerk as the exhibits were being prepared for the jury. In general, at the close of trial, the Courtroom Deputy does not deliver the exhibits to the jury room until both sides have agreed that they are correct and that they include only the exhibits which have been admitted into evidence. This procedure was followed in this case. Each side agreed that the binders– *i.e.*, the original marked exhibits in three-ring binders plus the additional admitted exhibits that had been provided to and were in the possession of the Court – contained all of the correct, admitted exhibits and none of the unadmitted exhibits. The exhibit binders were explicitly approved by Rust-Oleum and NIC prior to being delivered to the jury. Therefore, any objection to these exhibits were waived by the parties and any error in the jury's consideration of them was harmless.

Additionally, the Boniminio Declaration mis-identifies most of the exhibits as unadmitted. On September 11, 2024, after the Pretrial Conference was held, the Court issued an Order (ECF #330) stating:

> The parties shall file a joint status report by noon on Friday, September 13, 2024. The report shall contain: … 3) An update as to discussions regarding objections to exhibits: what has been resolved what has not been resolved, and what needs to be resolved prior to trial.

However, no Joint Status Report was ever filed.

The Court held a final Pretrial Conference on Monday, September 16, 2024. At that conference, counsel for Rust-Oleum, Colleen O'Neil, indicated that many of Rust-Oleum's objections to exhibits had been based on the documents being "incomplete, and it looked like either copying errors or just submission errors." PTC Tr. 19 (ECF #357). Counsel for NIC, Dave Paradis, responded that in most cases these exhibits were e-mails, and they contained long threads of conversations that were irrelevant, which would be confusing to admit into evidence. *Id.* The Court ultimately decided that this issue needed to be dealt with on a case-by-case basis as the trial went along. *Id.* at 21. The Court ordered that if a party were introducing something that the other party felt was incomplete, the objecting party could make the objection, and the Court would rule on it. Otherwise, the Court indicated that these exhibits would be received. *Id.* The parties did not raise any further objections to exhibits at that time. Therefore, unless an objection was made during the trial, the Court assumed that the following Exhibits were not objected to, and therefore admitted: 233, 238, 239, 244, 267, 283, 284, 293, 301, 303, 318, 319, 320, 321, 322, 323, 324, 335, 337, 339, 342, 348, 357. This list constitutes over half of the list that the Boniminio Declaration states are "unadmitted" NIC exhibits.

Similarly, to the extent that Rust-Oleum objected, pre-trial, to exhibits that lacked Bates stamps, and NIC modified those exhibits to include Bates stamps, those exhibits were also admitted. This includes many of the exhibits included in the Boniminio Declaration as "unadmitted," including Exhibits 216, 219, 230, 233, 235, 238, 241, 302, 303, 336, 348. Exhibit 236 was objected to only as a duplicate of another exhibit. Exhibits 292 and 364 were objected to only on the grounds of "relevance," without further explanation. Rust-Oleum's objections to these exhibits were not renewed after the Court's order to confer and report back at the initial Pretrial Conference. Admission of these exhibits was proper, or harmless error.

Only 8 of the 41 exhibits identified by the Boniminio Declaration as "unadmitted" NIC exhibits are remaining. The Court reviews these eight exhibits and finds that they were either properly admitted or that their admission was harmless error.

### a.  Admission of Exhibit 202 was harmless error.

NIC president Brian Hall testified that in an effort to keep its trade secret formulas secret, NIC required each employee to sign a confidentiality agreement. Hall Tr. 413 (ECF #359). This fact was undisputed. Exhibit 202 is a Form Employment Agreement used by NIC, which is cumulative of that fact, but not prejudicial. Rust-Oleum's only objection to this exhibit prior to trial was that it was not signed or dated and thus it was unclear when it was in effect. Admission of this exhibit was harmless error.

### b.  Admission of Exhibit 217 was harmless error.

Exhibit 217 is an email from Wipe New representative Tony Bender to Brian Hall dated 1/17/2013, regarding the need to order more Wipe New product to meet new Walmart business. Substantively, this was a follow-up e-mail to Floyd Kuriloff's email of 12/20/2012 to Hall in Exhibit 214, which was admitted, and it told how Wipe New LLC had gained entry into

Walmart. The fact that Wipe New gained entry into Walmart was undisputed. Rust-Oleum objected to this exhibit as hearsay prior to the Pretrial Conference (ECF #287) but did not make any further objection after the Court ordered the parties to confer and report any lingering objections to exhibits. The Court finds that Exhibit 217 is cumulative background information predating Rust-Oleum's involvement. While it is cumulative and potentially hearsay, it is not prejudicial. Admission of this exhibit was harmless error.

### c. Exhibit 238B was properly admitted.

Exhibit 238B is an email from Tony Bender to Neal Barry, discussing the possibility of facilitating a working relationship between "the Source" (NIC) and Rust-Oleum. In the e-mail, Tony Bender says, about the Wipe New product, "We understand this is a trade secret but would like to have as detailed a description as the source is willing to share." Rust-Oleum's objection to this exhibit prior to trial was that the Bates stamp was missing from the page, and that the inclusion of three separate emails with different dates and subject lines in a single exhibit could be confusing. NIC modified the documents to include the Bates stamp and to separate the emails, and no further objection was made by Rust-Oleum.

No objection about the reference to a trade secret was ever made about this exhibit. Considering the parties' own contractual agreements also called the Wipe New products a trade secret, and the Court instructed the jury that the formula had to comply with the statutory definition of a trade secret, the Court finds this exhibit was not prejudicial. Additionally, Exhibit 238B contains the rest of the e-mail chain that is contained in part in Exhibit 238A, which was introduced to the jury by counsel for Rust-Oleum during the testimony of Brian Hall. Hall Tr. 335 (ECF #360). Therefore, this exhibit is admissible under Rule 106.

### d. Admission of Exhibit 290 was harmless error.

Exhibit 290 contains excerpts from Rust-Oleum's Supplemental Responses and Objections to NIC's First Set of Interrogatories. The Response is consistent with Rust-Oleum's position, which it maintained throughout the trial, that it did not know what was in NIC's formula. Rust-Oleum does not identify any prejudice to the admission of this document and the Court can find none. Any error in the admission of this exhibit was harmless.

### e.  Exhibit 292 was properly admitted.

Exhibit 292 is a Sample Testing Agreement between NIC and Rust-Oleum for a project they were considering for development, called Paint Job. Brian Hall testified that Rust-Oleum wanted NIC to develop a paint restoration product.  Hall Tr. 480 (ECF #360). Rust-Oleum withdrew objections to Exhibits 291 and 292 in open court. Tr. 881-882 (ECF #361). This exhibit was therefore properly admitted.

### f.  Admission of Exhibit 345 was harmless error.

Exhibit 345 is NIC's cease-and-desist letter to Rust-Oleum concluding that Rust-Oleum violated the Sales Agreement by reverse engineering NIC's formulas.  Rust-Oleum objected to this exhibit pre-trial as hearsay (ECF #290), but did not make any further objection after the Court ordered the parties to confer and report back about any lingering objections to exhibits. Additionally, the parties stipulated that this letter was sent.  Stipulated Facts (ECF #323). Counsel for Rust-Oleum questioned Brian Hall about the letter during his testimony, Tr. 528-529 (ECF #360), and counsel for Rust-Oleum told the jury about it in opening statement. Tr.110 (ECF #358). The court instructed the jury that the letter in this exhibit was sent and that Rust-Oleum denied all wrong-doing and alleged that it independently developed its own formula. (ECF #350 p. 6).  To the extent that admission of this exhibit was error, it was harmless.

### g.  Exhibits 357, 357A, 357B, 357C were properly admitted.

Exhibit 357 originally consisted of four documents that contained the formulas for Wipe New. Rust-Oleum objected to offering them all together as one exhibit, so NIC separated them into four exhibits consisting of 357, 357A, 357B and 357C. Rust-Oleum did not renew its objection pre-trial, and any objection during the trial was overruled.

Rust-Oleum now contends, through the declaration of Colleen O'Neil (ECF #437), which was submitted with Rust-Oleum's Reply memorandum in support of its Motion for Judgment as a Matter of Law, that Exhibit 357C is prejudicial because it contains "misleading and manufactured formula disclosures." Exhibit 357C is a comparison of the Rust-Oleum formula to the NIC formula prepared by NIC expert witness Dr. Lukacs and testified to by him. Lukacs Tr.1125-1127 (ECF #370). Similar information is set forth in Ex. 365A, which was admitted and published to the jury by NIC as a part of Dr. Lukacs direct testimony, and then again on cross-examination. *Id.* at Tr. 1149-1157. Counsel for Rust-Oleum thoroughly cross-examined Dr. Lukacs on the information contained in this document, and the Court finds that its admission is not prejudicial. Admission was proper and any error is harmless.

### h. Exhibit 359 was properly admitted.

Exhibit 359 is the expert report addendum, dated 7/25/2024, which was added to NIC's original expert report by Dr. Williams, Exhibit 358A. Exhibit 359 addresses the updated information provided by Rust-Oleum's expert Ms. Train in her report. Rust-Oleum does not offer any specific claims of prejudice as to this document, but to the extent that they exist, they are addressed by the Court's discussion of the expert opinions and written expert reports, above.

### i. Admission of Exhibit 364 was harmless error.

Exhibit 364 is a standard test method for VOC testing. Many witnesses testified as to the VOC issue, including Rust-Oleum witnesses. Rust-Oleum does not offer any specific claims of prejudice as to this document. If this exhibit was admitted in error, it was harmless.

In sum, the parties waived their objections to the exhibits that were submitted for jury consideration by explicitly approving the exhibits contained in the binders prior to the jury's deliberation. Nevertheless, a thorough evaluation of the exhibits that Rust-Oleum objects to shows that many of them were in fact properly admitted, and the few exhibits that may not have been admitted were not prejudicial or harmful to Rust-Oleum. Rust-Oleum concedes that far more of its own exhibits –potentially up to 76 "unadmitted" Rust-Oleum exhibits– were also submitted to the jury for consideration. Therefore, the Court cannot find any prejudice to Rust-Oleum, even when considering the cumulative effect of the few NIC exhibits that were erroneously admitted. The motion for a new trial is denied.

### VIII.   NIC is entitled to prejudgment interest.

Rust-Oleum moves to strike the Court's award of prejudgment interest. The Court addressed this issue in the Opinion and Order (ECF #387) entered on January 28, 2025, and the Court construes this as a motion for reconsideration. Rust-Oleum offers no new evidence or case law, or any new argument on this issue. Rust-Oleum's motion is therefore denied.

### ORDER

Rust-Oleum's Motion for Judgment as a Matter of Law, or in the alternative Motion for New Trial (#412) is DENIED.

It is so ORDERED and DATED this ___25___ day of July, 2025.

MARK D. CLARKE
United States Magistrate Judge